NATIONAL ASSOCIATION OF PROPERTY OWNERS; National Park Inholders Association; Ely–Winton Boundary Waters Conservation Alliance; Local 4757 United Steel Workers of America; Lac La Croix Indian Band; Greater Virginia Area Chamber of Commerce; Crane Lake Commercial Club; Minnesota Arrowhead Association; Ely Chamber of Commerce; Carol M. Fisher; Border Lakes Association; Crane Lake Voyageur Snowmobile Club, Inc.; Crane Lake Sportsmen's Club; Ash River Namakan Lake Association; Charlotte Ekroot, d/b/a Windigo Lodge; Robert J. Handberg, d/b/a Campbell's Cabins and Trading Post; Plaintiffs,

and

State of Minnesota, Plaintiff–Intervenor,

v.

UNITED STATES of America; Bob Bergland, Secretary of Agriculture, Individually and in his official capacity; Defendants,

and

Sierra Club; Friends of the Boundary Waters Wilderness; League of Women Voters of Minnesota; Izaak Walton League of America, Inc.; Minnesota Rovers; Wilderness Inquiry II; Minnesota Environmental Control Citizens Association; Minneapolis Chapter, National Audubon Society; St. Paul Chapter, National Audubon Society; Duluth Chapter, National Audubon Society; Minnesota Ornithologists' Union; The Wilderness Society; Defendant–Intervenors.

STATE OF MINNESOTA by Joseph N. Alexander, its Commissioner of Natural Resources, Plaintiff,

and

Carl Brown, d/b/a Walleye Bait & Tackle Co.; Viking Cruises, Inc.; Concerned Citizens of Northeastern Minnesota; Boundary Waters Landowners Association, a Minnesota non–profit corpora-

tion; Koochiching County; City of South International Falls; Village of Ranier; International Falls Chamber of Commerce; Minnesota United Snowmobilers Association, Inc.; City of International Falls; Plaintiff–Intervenors,

v.

Robert BERGLAND, Individually and as Secretary of Agriculture of the United States; Defendant,

and

Sierra Club; Friends of the Boundary Waters Wilderness; Izaak Walton League of America, Inc.; The League of Women Voters of Minnesota, Inc.; Minnesota Rovers; Wilderness Inquiry II; Minnesota Environmental Control Citizens Association; Minneapolis Chapter, National Audubon Society; St. Paul Chapter, National Audubon Society; Duluth Chapter, National Audubon Society; Minnesota Ornithologists' Union; The Wilderness Society; Defendant–Intervenors.

NATIONAL ASSOCIATION OF PROPERTY OWNERS; Ely–Winton Boundary Waters Conservation Alliance; Range Actioneers, Inc.; Crane Lake Sportsmen's Club; City of Winton; Plaintiffs,

v.

Bob BERGLAND, Individually and in his official capacity as Secretary of Agriculture; R. Max Peterson, individually and in his official capacity as Chief of the United States Forest Service; Defendants,

and

Sierra Club; Friends of the Boundary Waters Wilderness; League of Women Voters of Minnesota; Izaak Walton League of America, Inc.; Minnesota Rovers; Wilderness Inquiry II; Minnesota Environmental Control Citizens Association; Minneapolis Chapter, National Audubon Society; St. Paul Chapter, National Audubon Society; Duluth Chapter, National Audubon Society;

Minnesota Ornithologists' Union; The Wilderness Society; Defendant–Intervenors.

Civ. Nos. 5–79–95, 5–79–178 and Civ. 5–80–25.

United States District Court, D. Minnesota, Fifth Division.

July 24, 1980.

Dayton, Herman, Graham & Getts by Charles K. Dayton and James A. Payne, Minneapolis, Minn., for Friends of the Boundary Waters Wilderness; League of Women Voters of Minnesota; Izaak Walton League of America, Inc.; Minnesota Rovers; Wilderness Inquiry II; Minnesota Environmental Control Citizens Ass'n; Minneapolis Chapter, National Audubon Society; St. Paul Chapter, National Audubon Society; Duluth Chapter, National Audubon Society; Minnesota Ornithologists' Union and The Wilderness Soc.

Wayne H. Olson, Sp. Counsel, Minneapolis, Minn., and Warren Spannaus, Atty. Gen. by Philip J. Olfelt, Asst. Atty. Gen., St. Paul, Minn., for State of Minnesota.

Joseph Alexander, Minneapolis, Minn., Johnson, Essling, Williams Essling & Daly, Ltd. by William W. Essling and David E. Essling, St. Paul, Minn., for Carl Brown, d/b/a Walleye Bait & Tackle Co.; Viking Cruises, Inc.; Concerned Citizens of Northeastern Minnesota; Boundary Waters Landowners Ass'n; Koochiching County; City of South International Falls; Village of Ranier; International Falls Chamber of Commerce and City of International Falls.

O'Connor & Hannan by Frank J. Walz and Thomas R. Sheran, Minneapolis, Minn., for United Snowmobilers Ass'n, Inc.

Ben A. Wallis, Jr., San Antonio, Tex., and Keith Brownell, Duluth, Minn., for National Ass'n of Property Owners; National Park Inholders Ass'n; Ely–Winton Boundary Waters Conservation Alliance; Local 4757, United Steelworkers of America; Lac La Croix Indian Bank; Greater Virginia Area Chamber of Commerce; Crane Lake Commercial Club; Minnesota Arrowhead Ass'n; Ely Chamber of Commerce; Carol M. Fisher; Border Lakes Ass'n; Crane Lake Voyageur Snowmobile Club, Inc.; Crane Lake Sportsmen's Club; Ash River Namakan Lake Ass'n; Charlotte Ekroot, d/b/a Windigo Lodge; Robert J. Handberg, d/b/a Campbell's Cabins and Trading Post; Range Actioneers, Inc. and City of Winton.

Thomas K. Berg, U.S. Atty. by Thorwald H. Anderson, Jr., and Francis X. Hermann, Asst. U. S. Attys., Minneapolis, Minn., and James T. Draude, Land & Natural Resources Div., Dept. of Justice, and James P. Perry, Dept. of Agriculture, Washington, D. C., and James Pfeil, Dept. of Agriculture, Milwaukee, Wis., for U. S., Bob Bergland and R. Max Peterson.

Faegre & Benson by Brian B. O'Neill, F. Reid Carron, Charles E. Bohlen, Jr., James G. Ray, Charles S. Ferrell, James E. Nicholson, Rebecca L. Rom and Betsy Taylor, Stephen J. Snyder and Richard N. Flint, Minneapolis, Minn., and David P. Pearson, St. Paul, Minn., and Marcia Gelpe, Minneapolis, Minn., for Sierra Club.

## MEMORANDUM OPINION AND ORDER

MILES W. LORD, District Judge.

### I. *INTRODUCTION*

Before the Court are parties' motions and cross motions for summary judgment in three separate lawsuits challenging Congress' most recent legislation concerning the Boundary Waters Canoe Area.

In *National Ass'n of Property Owners v. United States,* Civil 5–79–95 (D.Minn.1979), plaintiffs challenge certain provisions of the Boundary Waters Canoe Area Wilderness Act (BWCAW Act), Pub.L. No. 95–495, 92 Stat. 1649 (October 21, 1978). This particular action raises five key issues:

1. Did Congress unlawfully delegate authority to the Secretary of Agriculture to draw the boundaries of the new Wilderness Area?

2. Does the Act, by limiting motorboat and snowmobile use in the Wilderness, discriminate, unconstitutionally, against the class of all handicapped persons and the class of all persons less physically fit?

3. Do §§ 4, by limiting motorboat and snowmobile use in the Wilderness, and 5, containing provisions for the purchase of properties around the BWCAW, of the BWCAW Act infringe plaintiffs' Ninth and Fifth Amendment rights?

4. Does the BWCAW Act conflict with the Webster–Ashburton Treaty of 1842?

5. Does alleged selective enforcement of the Act by the United States Forest Service give rise to any rightful claims by these plaintiffs?

In *Minnesota v. Bergland,* Civil 5–79–178 (D.Minn.1979), the state and plaintiff–intervenors challenge the constitutionality of the BWCAW Act; their claim is essentially that the federal government has power to regulate only those lands and waters that it owns. Plaintiffs assert that certain sections of the Act, to the extent that they regulate lands and waters not owned by the federal government, violate the Tenth Amendment of the United States Constitution. The sole issue raised in this lawsuit concerns whether Congress is constitutionally empowered to regulate those surface waters and lands within the Wilderness Area not owned by the federal government.

In *National Ass'n of Property Owners v. Bergland,* Civil 5–80–25 (D.Minn.1980), plaintiffs seek to enjoin the Secretary of Agriculture and the United States Forest Service from enforcing the 1978 Act. Plaintiffs allege that implementation of the legislation constitutes a major federal action significantly affecting the quality of the human environment, within the meaning of § 102(2)(C) of the National Environmental Policy Act, (NEPA), 42 U.S.C. § 4332(2)(C) (1976), necessitating the filing

of an Environmental Impact Statement (EIS). The sole question raised in this cause concerns whether NEPA, in fact, requires these federal defendants to file an EIS prior to enforcing the BWCAW Act.

All issues have been extensively briefed and the Court has entertained counsel's oral presentations at two full days of hearings. Now, after careful review of all the files, all memoranda and counsel's oral argument, the Court is prepared to rule.

## II. THE BOUNDARY WATERS CANOE AREA WILDERNESS

### A. The History of the Area to 1978

The BWCAW rests along the Minnesota–Canada border for 110 miles. The Wilderness encompasses 1,075,000 acres.[1] East of the Rockies, it is the largest unit of the National Wilderness Preservation System; it is the second largest unit in the entire system. The BWCAW is the only lakeland canoe area in the entire nation. The area is made up of over 1,000 lakes, joined together by streams and portages. This area was the only means of travel for the legendary fur traders who navigated water routes pioneered by the Sioux and Chippewa.[2]

Notwithstanding the fact that extensive logging has occurred in the Wilderness Area, it still offers sanctuary to over 540,-000 acres of virgin forests. This Wilderness is home to hundreds of species of unusual birds, plants and animals settled in scores of ecological communities. The area harbors such wildlife as the bald eagle, osprey, otter, beaver, moose, deer, snowshoe hare, porcupine, eastern timber wolf, pine marten, fisher and lynx. The boundary waters support sturgeon, pickerel, suckers and lake trout. Nearly every lake is populated by loons.

The dark forest is the keynote to the Wilderness, filled with jackpine and balsam fir. The forest is accented with feather mosses, stunted black spruce, labrador tea, swamp laurels and pitcher plants.

The extent to which the federal government has extended its protection over the Wilderness has varied for over 75 years. The history of federal involvement began back in 1902, 1905 and 1908, when the federal government set aside over one million acres of land as a federal forest reservation. In 1909, President Theodore Roosevelt established, by proclamation, the Superior National Forest.

In 1926, Secretary of Agriculture William M. Jardine created the first Superior Wilderness Area, assuring that no roads would be constructed in at least 1,000 square miles of the best canoe country.

In 1930, Congress enacted the Shipstead–Newton–Nolan Act, 16 U.S.C. § 577 et seq. (1976), which prohibited logging within 400 feet of any lakeshore, and regulated the waters and water levels within the Superior National Forest.

In 1948, Congress enacted the Thye–Blatnik Act, 16 U.S.C. § 577c (1976), which directed the Secretary of Agriculture to acquire lands, or interests in lands, for the purpose of extending the wilderness canoe country. Also in 1948, the Forest Service established the Superior, Little Indian Sioux, and Caribou Roadless Areas, along with authorizing road construction and pulpwood timber sales in large areas previously promised to be kept free of roads by Secretary Jardine. In 1949, President Harry Truman issued Executive Order No. 10092 which established a 4,000 foot airspace reservation over the Wilderness.

In 1956, Congress authorized the appropriation of $9 million for the implementation of the Thye–Blatnik Act. See the Humphrey–Thye–Blatnik–Andresen Act of 1956, 16 U.S.C. §§ 577d–1, 577g–1 and 577h (1976).

In 1964, Congress passed the Wilderness Act of 1964, which forbade the use of motorized vehicles in almost all Wilderness

---

1. The 1978 Act enlarged the BWCA by 45,500 acres. This addition represented a compromise worked out in the Conference Committee. The original House bill sought to enlarge the Wilderness by 47,000 acres.

2. For an historical appreciation of the Quetico–Superior area, see R. Newell Searle, Saving Quetico–Superior–A Land Set Apart, at 1–16 (Minnesota Historical Society Press 1977).

areas. The Act, however, specifically excepted the BWCA from full Wilderness status. Section 4(d)(5) provided:

> Other provisions of this Act to the contrary notwithstanding, the management of the Boundary Waters Canoe Area ... shall be in accordance with regulations established by the Secretary of Agriculture in accordance with the general purpose of maintaining, without unnecessary restrictions of other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams, and portages: *Provided*, That nothing in this Act shall preclude the continuance within the area of any already established use of motorboats.

16 U.S.C. § 1133(d)(5) (1976). The original 1956 version of the Wilderness Act did not include this provision.

In 1965, Secretary of Agriculture Freeman promulgated a management plan for the BWCA pursuant to the directive in § 4(d)(5) of the Wilderness Act. The Secretary designated 19 routes, covering over 100 lakes and 60 per cent of the area's surface water for both motorboat and snowmobile use. Secretary Freeman divided the BWCA into an Interior Zone and a Portal Zone, closing all logging in the former and allowing such in the latter.

In 1978, Congress enacted the BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649 (October 21, 1978); plaintiffs in the instant actions challenge certain provisions of this Act which is Congress' last word on the BWCA.

**B.** *The 1978 Act*

The new Act redesignates the BWCA as the Boundary Waters Canoe Area Wilderness. The three units of the Wilderness are linked by a Mining Protection Area, which offers protection from the adverse effects of mining in the area. While the Act restricts motor usage in the Wilderness, the final version of the bill allows about half of the pre–Act motorboat usage to continue. About one–third of the water area of the BWCAW is now open to motorboat use. The 1978 Act lifts the snowmobile ban by authorizing the Secretary to permit snowmobile usage on two designated trails indefinitely and on three trails for up to five years.

The Wilderness' boundary is extended in the new Act by the addition of 45,500 acres. The Act also provides that qualifying resort owners may force the purchase of their property by the Secretary through September 1985. The Secretary, under certain conditions, is also granted the right of first refusal to acquire specified lands.

The 1978 Act phases out timber harvesting and maintains existing small dams in the area if necessary to protect wilderness values or public safety. The specific provisions challenged in the instant actions are more fully explored throughout the remainder of this Order.

**III.** *THE CASES*

### THE FIRST CASE

**A.** *National Ass'n of Property Owners v. United States*, Civ. 5–79–95

**1.** *Facts*

**a.** *Parties*

The plaintiffs include two national organizations: the National Association of Property Owners, headquartered in San Antonio, Texas, and the National Parks Inholders Association, headquartered in Tahoe, California. These two plaintiffs object to the 1978 Act as it allegedly restricts the rights of their members to own, use, control, and dispose of their property.

Local plaintiffs include the Ely–Winton Boundary Waters Conservation Alliance; the Crane Lake Commercial Club, Inc.; Local 4757, United Steelworkers of America; Virginia Area Chamber of Commerce; Minnesota Arrowhead Association; Ely Chamber of Commerce; Border Lakes Association of Crane Lake; Crane Lake Voyageur Snowmobile Club, Inc.; Crane Lake Sportsmen's Club, Inc.; and Ash River Namakan Lake Association; which are all organizations based in northern Minnesota consisting of individuals who use the

BWCAW or who own businesses on the periphery of the BWCAW.

Plaintiff Carol M. Fisher is a handicapped individual from Ely, Minnesota, who uses the BWCAW, and plaintiff Charlotte Ekroot is the owner of a resort on the Gunflint Trail near the BWCAW who claims the 1978 Act has injured her business.

Two plaintiffs own resorts in Canada. Plaintiff Robert J. Handberg is a resort owner on the north side of Lac La Croix, in Canada; and plaintiff Lac La Croix Indian Band consists of 240 individuals, some of whom are tourist guides on Lac La Croix, who are located, like Handberg, on the Canadian side of Lac La Croix.

Defendant Bob Bergland is the Secretary of Agriculture and, along with others, is charged with the implementation of the 1978 Act. The United States of America is the other federal defendant.

Defendant–intervenors Sierra Club; Friends of the Boundary Waters Wilderness; League of Women Voters of Minnesota; Izaak Walton League of America, Inc.; Minnesota Rovers; Wilderness Inquiry II; Minnesota Environmental Control Citizens Association; the Minneapolis, St. Paul, and Duluth Chapters of the National Audubon Society; the Minnesota Ornithologists' Union; and The Wilderness Society are all organizations whose members use the BWCAW. These groups were active in the passage of the 1978 Act. Many of the groups, including the Sierra Club, the League of Women Voters, the Izaak Walton League and The Wilderness Society, have been involved in preserving the wilderness aspects of the BWCAW from the early days of this century. Defendant–intervenor Wilderness Inquiry II provides canoe trips into the BWCAW for handicapped individuals.

### b. *Procedural Posture*

This action was initially filed in the United States District Court for the District of Columbia. On July 17, 1979, plaintiffs' motion for a temporary restraining order was heard by the Honorable Harold H. Greene, who denied that motion. Plaintiffs then dismissed their action without prejudice and refiled it in Minnesota. On August 7, 1979, Magistrate Judge Patrick J. McNulty heard plaintiffs' motion for a temporary restraining order and the defendant–intervenors' motion to intervene. On August 9, 1979, he granted the motion to intervene and recommended to this Court that the motion for a restraining order be denied. This Court denied the motion for a restraining order on August 28, 1979.

The defendant–intervenors moved to dismiss this action for failure to state a claim, or, in the alternative, for summary judgment on August 6, 1979. On August 24, 1979, the federal defendants followed suit. Arguments were heard by Magistrate Judge McNulty on September 10, 1979.

The plaintiffs moved to amend their complaint on September 28, 1979. The parties consented to amendment and the defendant–intervenors and federal defendants moved again for summary judgment. On October 29, 1979, the parties agreed that all the pending motions were submitted. Counsel for plaintiffs suggested that the Court delay resolution of this action as another action was to be filed by the State of Minnesota.

On December 27, 1979, the State of Minnesota filed a companion action challenging the constitutionality of the 1978 Act as an infringement of state water rights. *State of Minnesota v. Bergland*, Civil 5–79–178 (D.Minn.1979).

On January 18, 1980, a third action was filed by the National Association of Property Owners and others contending that the Secretary of Agriculture is required to promulgate an Environmental Impact Statement on implementation of the 1978 Act and asking that defendant Bergland be enjoined from implementing the 1978 Act. *National Ass'n of Property Owners v. Bergland*, Civil 5–80–25.

This Court formally referred all three actions to Magistrate Judge McNulty for hearing on March 27, 1980. At the request of counsel for plaintiffs in this action and counsel for the State of Minnesota, how-

ever, the Court recalled the three actions and set them all for hearing on April 17, 1980, and May 2, 1980.

On April 25, 1980, the State of Minnesota moved to intervene in the first action, Civil 5–79–95, on behalf of the National Association of Property Owners and the other plaintiffs. That motion was granted.

At the time of hearing, on May 2, 1980, the plaintiffs filed their motion for summary judgment in this action. There being no objection from the defendant–intervenors or the federal defendants to the plaintiffs filing their motion at that late date, the issues involved in this action are deemed submitted on cross–motions for summary judgment.

c. *Plaintiffs' Complaint*

The plaintiffs challenge the 1978 Act on numerous bases. Their challenges and the facts relevant to these challenges follow:

(1) *The First Cause of Action : The Map*

In plaintiffs' first cause of action, they state that Section 3 of the Act grants the Secretary of Agriculture the authority to establish boundaries and publish a map and legal description of the BWCAW. They then allege an unlawful delegation of legislative authority.

Section 3 of the Act itself states:

The areas generally depicted as wilderness on a map entitled "Boundary Waters Canoe Area Wilderness and Boundary Waters Canoe Area Mining Protection Area" dated September, 1978, comprising approximately one million and seventy–five thousand five hundred acres, are hereby designated as the Boundary Waters Canoe Area Wilderness .... The map of the wilderness shall be on file and available for public inspection in the offices of the Supervisor of the Superior National Forest and of the Chief, United States Forest Service. The Secretary of Agriculture ... shall, as soon as practicable but in no event later than one year after the date of enactment of this Act, publish a detailed legal description and map showing the boundaries of the wil-

derness in the Federal Register. . . . Such map and description shall be filed with [the appropriate congressional committees] .... Such map and description shall have the same force and effect as if included in this Act.

Pub.L. No. 95–495, 92 Stat. 1649, 1649–50 (1978).

Section 3 states that Congress had reference to a map–the map of September, 1978–when the Act was enacted; the Act denominates the areas on that map as the Boundary Waters Canoe Area Wilderness.

Changes from the boundaries existent prior to the Act were described in great detail during the congressional consideration of the bill. The Report of the House Committee illustrates the care with which Congress addressed possible boundary problems:

The Committee notes that there has been much concern regarding the drawing of the exact boundaries of the wilderness. In order to eliminate any misunderstanding as to the location of the boundary, the Committee has supplied the United States Forest Service with detailed maps of the changes in the original BWCA boundary. These maps are to be used by the agency in preparing the final official boundary map for the wilderness. The Committee has also supplied the agency with detailed maps that make clear the points at which motor use is to be terminated on various lakes.

Legislative History of the Boundary Waters Canoe Area Wilderness (Pub.L. No. 95–495) at page 79 (December, 1978) [hereinafter *Legislative History*]. This care extended to remedying technical problems with the pre–Act boundaries which had been brought to Congress' attention:

The Committee has held to the principle of making no deletions from the established boundaries of the existing Boundary Waters Canoe Area Wilderness as created by the 1964 Wilderness Act. However, five minor flaws in the existing boundaries were brought to the Committee's attention. These have been corrected by small technical deletions. Three

other small technical deletions were required to develop consistent and reasonable motorboat restrictions. These eight technical deletions are listed and described herewith . . . .

*See Legislative History* at 79–80.

This deliberateness continued in the Senate. The Report of the Senate Committee on Energy and Natural Resources noted that six changes were made in the boundaries proposed by the House and described those differences in detail. *See Legislative History* at 240.

Even as late as the debate on the conference report, the bill's sponsors took pains to avoid any confusion about the boundaries. Congressman Burton, the floor manager of the bill in the House, stated during the debate:

Certain other larger additions also include 400–foot shoreline additions along a portion of their perimeters to include all of the following lakes and river . . . .

. . . . .

Detailed U. S. Geological Survey quadrangle maps showing each of these 400–foot lakeshore additions have been placed on file with the Chief, U. S. Forest Service, Washington, D.C., but, of course, it was difficult to accurately depict the 400–foot strips because of the limitations of map scales. The Senate report on H.R. 12250 already mentions these additions briefly, but I think it is important to describe the rationale and records involved in more detail so that there will be no confusion about them.

*Legislative History* at 299.

While the plaintiffs' first cause does not appear to challenge the location of motorboat and snowmobile routes—which are unlikely to be characterized as "boundaries"—the Court notes that such standards were provided by the statute and legislative history with equal, if not greater, clarity and detail. *See* § 4 BWCAW Act, Pub.L.No.95–495, 92 Stat. 1649, 1650–52 (1978). *See also Legislative History* at 78, 135, 145, 148–49, 231–32, 256–57, 261, and 267–69.

The device of establishing legal boundaries through a map reference has been utilized frequently by Congress. A review of recent park and Wilderness laws reveals an approach virtually identical to that taken by § 3 of the BWCAW Act. *See, e. g.*, The Absaroka–Beartooth Wilderness, Custer and Gallatin National Forest Act, Pub.L. No.95–249, 92 Stat. 162 (March, 1978); Chattahoochee River National Recreation Area Act, Pub.L.No.95–344, 92 Stat. 474 (August, 1978); Eleanor Roosevelt National Historic Site Act, Pub.L.No.95–32, 91 Stat. 171 (May, 1977).

(2) *Amended Count One–The Map*

In amended count one, the plaintiffs allege that the Secretary has failed to provide the map of September, 1978 for public inspection and is attempting to publish an incorrect detailed map in the Federal Register. However, Betty Salerno, a member of the plaintiff Ely–Winton Boundary Waters Conservation Alliance, viewed the map of September, 1978 in Washington, D.C., on July 11, 1979. *See* Affidavit of Betty Salerno, Civil 5–79–95 (D.Minn. August 29, 1979). (Exhibit 3A of Plaintiffs' Memorandum in Support of Motion to Amend and Supplement Complaint.)

The Secretary tardily published the legal description of the BWCAW and a map, consisting of 21 detailed map sheets, in the Federal Register on April 6, 1980. The Federal Register stated that copies of the map sheets were available for purchase.

In this action, there are no allegations concerning boundary errors and no parties before the Court who claim to have property affected by an incorrect boundary designation.[3]

In § 3 of the new Act, Congress itself designated the boundaries by use of the map of September, 1978. Congress then required the Secretary to publish a legal description and map for the public in the Federal Register and make the legal description and maps available for public inspection. That has been done.

---

**3.** It appears that plaintiffs' only claimed inconsistencies concern motorized routes; motorized routes, however, are controlled by the words of the statute and not the map.

**(3)** *The Second, Third and Fourth Causes of Action: Motorboat and Snowmobile Restrictions*

The second, third, and fourth causes of action challenge those provisions of the 1978 Act regulating: (1) the lakes upon which motorboats may be used, (2) the horsepower limitations on lakes where motors may be used, and (3) snowmobile use in the Boundary Waters Wilderness. The regulation of motorized use is allegedly illegal because it: (1) violates the right to travel guaranteed by the Due Process Clause of the Fifth Amendment, (2) disparages personal rights guaranteed by the Ninth Amendment, and (3) violates a treaty in force between the United States and Canada—presumably the Webster–Ashburton Treaty of 1842.

The 1978 Act purposefully and clearly regulates the use of motorboats and snowmobiles in the BWCAW. Congress' rationale for regulating motorized use, gleaned from the legislative history of the 1978 Act, follows.

Under the 1964 Wilderness Act and Department of Agriculture's Orders, and prior to the 1978 Act, designated motorboat and snowmobile routes included sixty percent (60%) of the BWCAW's water surface; paddling canoeists, skiers, hikers, and snowshoers had to compete with gasoline engines during at least part of their wilderness trips. Seventy percent (70%) of visitor use was by those who traveled by canoe, ski, or foot. For those who sought the enjoyment of an environment free from the intrusion of machines, encounters with motors could have been more than simply annoying. Numerous witnesses testified before the Congress on the shattering effect of motors on the solitude of the Wilderness and a wilderness experience. There was sufficient testimony before the Congress for it to conclude that the whine or roar of motors within a Wilderness destroys solitude. *See Legislative History* at 3, 11, 110, 112, 114, 116, 119, 128, 129, 131, 132, and 140.

For people who wish to use motorboats, dozens of large lakes are available to them immediately outside the BWCAW, among them Crane, Vermilion, Rainy, and Gunflint Lakes. Similarly, snowmobilers can legally travel on national and state forest lands, on state lakes, in many state parks, and on thousands of miles of private and state trails. In contrast, those who desire to travel in a primitive, motor–free setting have only the BWCAW open to them. *See Legislative History* at 3.

While the 1978 Act does not completely ban motorboats and snowmobiles, it brings the BWCAW into line with other Wilderness areas where motorized uses are prohibited. Further, it brings the BWCAW into line with regard to the broad precepts set forth in the Wilderness Act. *See* 16 U.S.C. § 1131(c) (1976).

**(4)** *Amended Count Three–Motorboat Restrictions*

Plaintiffs also assert that the selection of lakes where motorboat use is permitted is arbitrary and capricious. Congress' rationale was to continue motorized uses on the most heavily used and long established routes by resort guests; the selection was the result of much debate and compromise. *See generally Legislative History* at pages 119, 123, 129, 131, 140, 143–49, 248–49, 260–63, 279–80, and 302.[4]

**(5)** *The Fifth Cause of Action: The Webster–Ashburton Treaty*

In their fifth cause of action–and apparently, in their fourth–plaintiffs raise claims under the Webster–Ashburton Treaty of 1842. In their fourth cause of action, plaintiffs allege that the Act's prohibition of snowmobile use and imposition of motorboat horsepower restrictions for specific lakes deprive them of their "absolute" right to travel internationally and violate "a treaty in force"–apparently the Webster–Ashburton Treaty–between the United States and Canada. In their fifth cause of action, plaintiffs again cite their "absolute" right

---

4. The plaintiffs also claim in various affidavits filed with the Court that the motorized use restrictions have hurt business. The Court notes there is presently no plaintiff before the Court asking for money damages under the Tucker Act.

to travel and allege that § 17 of the new Act, which provides that the Act shall not affect the provisions of any treaty now applicable to the Boundary Waters Wilderness, violates the Supremacy Clause of the Constitution. They further allege that the Act directly conflicts with the Webster–Ashburton Treaty.

The Webster–Ashburton Treaty, 8 Stat. 572 (1842), was negotiated by Daniel Webster and Alexander Lord Ashburton to establish the boundary line between the United States and Canada. Article II of the Treaty, which describes the boundary for the area of Minnesota in question, concludes with the following provision:

> it being understood that all the water communications and all the usual portages along the line from Lake Superior to the Lake of the Woods, and also Grand Portage, from the shore of Lake Superior to the Pigeon river, as now actually used, shall be free and open to the use of the citizens and subjects of both countries.

8 Stat. 572, 574 (1842).

Facts relevant to this claim include the following: Congress was aware that the province of Ontario had itself barred motorboats and snowmobiles in the Quetico Provincial Park, which adjoins the BWCAW along an extensive portion of the international boundary, with the exception of a few lakes where motors can be used by the Lac La Croix Indian Band. *See Legislative History* at 1–2, 89, 113, 124, and 140.

In addition, before passage of the Act, Congress sought and received advice from the State Department concerning the disputed provision of the treaty. In response to Congressman James Oberstar of Minnesota, Robert J. McCloskey, Assistant Secretary for Congressional Relations, unequivocally maintained that "[w]ith respect to your question on the use of mechanized transport on these waters, the Webster–Ashburton Treaty is clearly silent." Letter from Robert J. McCloskey to Hon. James L. Oberstar, Exhibit 7B to Affidavit of Dr. Miron L. Heinselman, *National Ass'n of Property Owners v. United States,* (D.Minn., July 28, 1979). Mr. McCloskey stated:

At the time, the Webster–Ashburton treaty was signed, the waterways and portages of this area were an important route to the West. We believe that the intent of the "free and open" provision for these waters was to ensure that this important route remained open, on an equal basis, to the nations of both countries. It would not be correct, however, to interpret "free and open" so broadly as to prohibit either United States or Canadian authorities from imposing any limitation upon the manner in which such waterways and portages may be used. In agreeing to free and open use of these waterways and portages, neither party intended to relinquish its sovereign role of imposing statutory limitations on behavior which would not be in the best interest of the respective country.

*Id.*

### (6) *The Sixth, Seventh and Eighth Causes of Action: Sales of Resorts to the Federal Government*

Section 5 of the Act provides for the following: If an owner of a resort on certain lakes denominated in the Act so desires, he may require the federal government to buy his property at fair market value as of July 1, 1978, or as of the date the owner gives notice to the Secretary. If the government is required to buy the resort, other lands on the lake may not be sold unless the lands are first offered to the Secretary. The Secretary has 100 days to decide whether to purchase the other land. If the Secretary decides not to purchase the other land at the offered price, it may not be sold to a third party at less than the offered price, unless it is first reoffered to the Secretary. An owner of a resort who requires the federal government to buy his land may retain three acres for his residence. The lakes to which the reoffer provision applies include thirteen lakes partly in and out of the BWCAW and two adjoining lakes.

The plaintiffs challenge (1) the right of first refusal provision on two grounds:

first, as an unlawful delegation of legislative authority to an owner of a resort who requires the federal government to purchase his resort thereby activating the right of first refusal and, second, as a taking of property without just compensation (count six); (2) the reoffer provision as being vague, that is, plaintiffs are unsure if there is a 100–day limit on the reoffer provision (count seven); and (3) the three–acre provision as being arbitrary (count eight).

The legislative history reflects the fact that Congress was very much concerned with the welfare of the local inhabitants. The Act thus contains provisions to assist the local population in adjusting to any inconveniences brought about by the Act's provisions. §§ 5 and 19 BWCAW Act, Pub. L.No.95–495, 92 Stat. 1649, 1652 and 1659 (1978). Addressing this concern, Senator Wendell Anderson of Minnesota stated that: "Many of the provisions of [the Act] are specifically geared toward assisting local businesses in adjusting to the new management plan." *Legislative History* at 307.

Section 5(a) of the 1978 Act is unique in American law in that it gives a resort owner whose business may be affected by the Act *the right* to require purchase by the federal government.

Original versions of the 1978 Act placed all property on the designated lakes under a right of first refusal from the date of passage of the Act. *See Legislative History* at 54. The provision was eventually softened so as to trigger the right of first refusal only after the government invested in an initial resort; the government had no need for a right of first refusal until it had an investment in the land around a lake.

Further relevant facts have been introduced during the course of this litigation; the federal government has informed the Court that it intends to construe the reoffer period as limited to 100 days. Second, the government has informed the Court that it presently has no intention to exercise its right to first refusal on Fall Lake or Moose Lake, two designated lakes, allaying the fears of local property owners.

### (7) *Amended Counts Six and Seven—Purchase Provisions*

The major contention in the added claims concerning § 5 of the Act is that the selection of lakes subject to the favorable buy—out provision is arbitrary and capricious. Congress, however, debated hard and long before it settled on the present language of § 5.

The House bill originally afforded thirteen lakes the favorable provisions. Each of the lakes was one on which motorboat restrictions were either to be imposed or which would be impacted. *See Legislative History* at 54. As to these lakes, the basis for selection is clear. With regard to the two lakes added to the original list of thirteen, Congress' rationale is likewise clear; the Act was intended to expand the boundaries of the Wilderness to include Wood Lake and the North Kawishiwi River, formerly outside the boundaries. Congress was concerned about the impact of the addition of these lakes on resorts that in the past had made a practice of storing boats for use by their customers on Wood Lake and the North Kawishiwi River, a practice banned within the boundaries:

In several of the additions to the wilderness made by H.R. 12250 there has been limited seasonal and/or year–round storage of "cached" boats on lakes or rivers at sites that will be within the wilderness upon enactment. Storage of boats of all types not being used in connection with a current visit is currently prohibited on Federal land within the BWCA by the Secretary's regulations, and on State land or water under Minnesota Department of Natural Resources regulation 1,000. Such storage of cached boats or canoes is clearly out of keeping with the purposes of the Wilderness Act, and it is our intention that such practices be prohibited within the additions to the wilderness made by H.R. 12250.

Storage of canoes just outside the wilderness boundary near certain lakes could be permitted by the Secretary as a means of facilitating appropriate wilderness use of such lakes by the guests of nearby re-

sorts. *In some cases such resort guests were the principal users of the cached boats within certain new wilderness additions.*

*Wood Lake and the North Kawishiwi River are examples of situations where canoe storage just outside the wilderness might help the resort economy and give resort guests an opportunity to fish in the wilderness with little portaging.*

*Legislative History* at 300 (emphasis added). Accordingly, the Senate added to § 5 the two nearby lakes that supported resorts which had been storing boats on Wood Lake and on the North Kawishiwi River: Jasper and Ojibway. *See Legislative History* at 233.

Plaintiffs have come forward with no parties or affidavits by parties who claim they are resort owners on non–buy–out lakes who want to avail themselves of the favorable buy–out provision in § 5.

There is also an added claim by plaintiffs to the effect that the Act, by failing to define "resorts," does not treat individuals on the § 5 lakes fairly, arguing that those property owners do not know whether their land is a qualifying "resort." However, presently no named plaintiff has come forward stating that he has approached the government pursuant to the Act's buy–out provision and that the government has told him he cannot avail himself of its provision because his land is not a resort.

(8) *Amended Count Seven–Additional Allegations Concerning the Right of First Refusal*

With regard to plaintiffs' other claims, they center upon impairment of property values. There is presently no *party* before the Court alleging that his or her property values have been impaired and asking for monetary relief.

(9) *Ninth Cause of Action: Allegations Concerning the Handicapped*

Plaintiffs claim that the Act violates Title VI of the 1964 Civil Rights Act and

§ 504 of the 1973 Vocational Rehabilitation Act, and constitutional rights of the handicapped, as the handicapped need the assistance of motors to enjoy the BWCAW.

The debate surrounding passage of the 1978 Act addressed the practical concerns of the handicapped. One of the sponsors of the Act, Representative Fraser, introduced into the *Congressional Record* a letter that underscored the crux of this issue; that letter stated:

The handicapped are no different from the rest of us .... To assume that only people with motors or hearty people need the solitude and peace of the true wilderness is a terrible injustice–a slam against the recreational and spiritual needs of all people.

*Cong.Rec.* E227 (daily ed. January 30, 1978).

The 1978 Act moves beyond the previous management scheme governing the Boundary Waters Wilderness in furnishing handicapped persons with greater opportunities. By eliminating motorboat use from some border lake chains, the Act in effect brings the wilderness–in the sense of a canoe–only zone–to the very edge of the BWCAW. A handicapped individual now has several routes on which the first lake is limited to non–motorized travel. Without motor restrictions, the handicapped are forced to travel across several lakes and portages to reach the solitude of wilderness.[5]

Programs are presently in operation that promote the use of the Wilderness by persons with handicaps. These programs help train the handicapped person in planning and executing trips into the Wilderness. In a statement made in the House of Representatives, Congressman Fraser called attention to one program of this kind operated by the Minnesota Outward Bound School. *See Cong.Rec.* H3161 (daily ed. April 6, 1977). Involving a ten–day course in which physically disabled and able–bodied persons participated in a rigorous regimen of "canoeing skills, expedition planning, physical conditioning, ropes course,

---

5. Even under the 1978 Act, many of the most heavily used entry points are on lakes where motors are still allowed in part as an accommodation to resorts, *e. g.*, Moose Lake, Fall Lake, Snowbank Lake, Seagull Lake, Clearwater Lake, and Lake Saganaga.

wilderness emergency care, search and rescue training, rock climbing, and ecology," *Id.* at H3161, the program sought both to help handicapped individuals fully enjoy a wilderness trip and to "assist organizations, facilities, and agencies serving the physically disabled to establish outdoor adventure programs for their clients." *Id.*

During the House floor debate on the House Interior Committee bill, Congressman Nolan, a sponsor of the bill, described a second program structured to meet the recreational needs of handicapped individuals:

I should like to briefly describe an organization whose expressed mission is to provide access to such wilderness areas to the handicapped. This organization calls itself the Wilderness Inquiry II and is one of three affiliate groups under the parent organization, the Wilderness Inquiry Association. Wilderness Inquiry II is designed to meet the recreational needs of the handicapped by providing access into such areas. It is intended that such excursions may be employed to assist handicapped individuals in coping with their disabilities by using the Wilderness as a means of developing self–confidence in themselves.

*Legislative History* at 128. Wilderness Inquiry II is a defendant–intervenor in this lawsuit.

The BWCAW Act also authorizes the Secretary to expand even further the opportunities for handicapped persons to use the Wilderness; § 18(d) of the Act provides:

The Secretary in cooperation with the State of Minnesota and other appropriate groups, consistent with the purposes of this Act, is authorized and directed to develop a program providing opportunities for a wide range of outdoor experiences for disabled persons.

§ 18(d) BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649, 1658–59 (1978). That the drafters of the legislation felt this to be an important provision is indicated by Congressman Burton's remarks during the House floor debate on the Interior Committee bill: "I have been pushing the Department generally, and do intend to produce

effective policy to the end that these experiences are made more relevant to those with physical handicaps." *Legislative History* at 126.

Even though handicapped persons do use the Wilderness and even though programs do exist which are designed to foster even greater handicapped use, certain portions of the Boundary Waters Canoe Area Wilderness will remain inaccessible to some of the handicapped. Any wilderness, however, affords a continuum of recreational experiences; although some areas are easily reached by even the most uninitiated wilderness traveler, others can be visited only by those possessing consummate back–country skills. In this respect, the handicapped and non–handicapped stand on equal terms–both groups must tailor their expectations to the requirements of the terrain in which they intend to travel.

To protect and preserve the Wilderness, the 1978 Act sets out a management strategy under which no special dispensation is made for handicapped individuals; this strategy represents an approach that will guarantee to the handicapped individual the same opportunity provided the able–bodied, i. e., the chance to participate in a lakeland canoe wilderness experience, an experience unique to the BWCAW.

(10) *The Tenth Cause of Action: Discrimination Against the Less Physically Fit*

In this count, plaintiffs claim that the provisions of the Act regulating motorboat use allow only those who are in excellent physical condition and who are able to paddle a canoe to use the Boundary Waters Wilderness. Accordingly, plaintiffs claim the Act violates the equal protection guarantees in the Fifth Amendment to the federal Constitution and the motorboat restrictions are in conflict with the purposes of the Act.

(11) *The Eleventh Cause of Action: Alleged Selective Enforcement*

The plaintiffs last allege that certain prohibitions in the Act are being selectively enforced–specifically, one individual has

been cited for violating motorboat restrictions while other motorboat violators have not been cited. This is claimed to be a violation of plaintiffs' equal protection rights.

There is no plaintiff in this action that is the subject of a citation.

### 2. *Discussion*

The United States, the defendant–intervenors, and the plaintiffs have all moved for summary judgment in *National Ass'n of Property Owners v. United States*, Civil 5–79–95 (D.Minn.1979). This particular action raises numerous challenges to the present Act. The parties have exhaustively researched the relevant issues and have submitted scores of memoranda and affidavits both in support and in opposition to the pending motions and cross–motion. After careful review of the entire file, all moving memoranda and counsel's oral presentations, the Court determines that this action presents an appropriate case in which to order summary judgment; defendants' and defendant–intervenors' motions are granted; plaintiffs' motion is denied.[6]

#### a. *The Map*

Plaintiffs' first cause of action raises two questions. The first question does not rise to a constitutional challenge. The second question raises a significant constitutional issue; however, it was resolved long ago and against the plaintiffs' favor.

##### (1) *Which Map Establishes the Boundaries of the BWCAW?*

■ Plaintiffs have maintained that there is so much confusion concerning the actual boundaries of the Wilderness that the Act must fail. They hypothesize the possibility that Congress had before it a map other than that one designated in § 3 of the Act as establishing the official boundaries of the Wilderness. In support of this postulation, plaintiffs' lead counsel, Mr. Wallis, has stated that he travelled all

the way from San Antonio, Texas, to Washington, D.C., in order to view the official map. Once in Washington, Mr. Wallis spoke with two secretaries. He spoke with Ms. Holliday, secretary to the Deputy Chief of the Forest Service, and Ms. Clark, secretary to the Chief of the Forest Service. Neither Ms. Holliday nor Ms. Clark was able to satisfy Mr. Wallis' request; discontented, Mr. Wallis chose to leave. More patient men would have persevered, for the map was there.

Since January 1979, the official map has been retained by Messrs. Leasure and Joy of the Recreation Management Division of the United States Forest Service; since that time it has been available for inspection. Immediately after his short visit to the offices of Mses. Clark and Holliday, Mr. Wallis was informed by letter where he could view the map. Apparently, Mr. Wallis has not actively sought to view the official map subsequent to his September trip to the nation's capital. It appears to the Court at this time that he'd rather curse the darkness than light a candle.

Congress identified the official map as that map entitled "Boundary Waters Canoe Area Mining Protection Area" dated September 1978. This map has been in the custody of the United States Forest Service since the enactment of the 1978 Act. It is available for Mr. Wallis' inspection. Furthermore, this "official map" and its more practical counterpart, published at 45 Fed. Reg. 23,006–23,040 (1980), are the only maps before the Court cloaked with statutory significance.

■ When reviewing any congressional Act, this Court must presume that each public official who took part in the legislative process has does his duty properly and that the administrators have faithfully and effectively carried out the mandate of Congress. Mr. Wallis' short trip to Washington and his brief inquiry there does not approach a showing which would amount to

---

**6.** Plaintiffs in this action moved for summary judgment on the basis that the 1978 Act interfered with the State of Minnesota's right to regulate water within the boundaries of the

BWCAW, an issue not pled by plaintiffs in this action. For the reasons stated in *Minnesota v. Bergland*, Civil 5–79–178, *infra*, plaintiffs' motion is denied.

overcoming this presumption. *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975), *cert. denied*, 423 U.S. 930, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975).

### (2) Has Congress Unconstitutionally Delegated Its Power to Establish The Boundaries of The Wilderness?

Plaintiffs contend that there has been an improper delegation by the Legislature to the administrator of the Act because there are no adequate statutory *standards* set out in the Act to guide the administrator. Plaintiffs assert that § 3 of the Act is an unconfined and vagrant abuse of the delegation power of Congress. In support of this proposition, plaintiffs urge a revitalization of the *Panama–Schechter* Anti–Delegation Doctrine. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). This doctrine was laid to rest in 1944 when the Court issued its ruling in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

Since the *Panama* and *Schechter* cases, *supra*, federal delegations have been uniformly upheld. An extremely broad delegation which reached the Court after *Panama* and *Schechter* concerned the delegation contained in the Emergency Price Control Act of 1942, 50 U.S.C.A. App. § 901, *et seq.* The Act authorized the Price Administrator to set maximum prices which in his judgment would be generally fair and equitable and would effectuate the purposes of the Act.

This delegation was challenged under the *Panama–Schechter* Doctrine; the Court, however, sustained the statute, reasoning that sufficiently precise standards were outlined in the Act. *Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Dissenting, Mr. Justice Roberts noted that the standards articulated in the Act challenged in *Yakus, supra*, were no more precise than those struck down as limitless in *Panama* and *Schechter*.

Justice Roberts concluded the *Yakus, supra*, overruled the *Panama–Schechter* Doctrine. 321 U.S. at 452, 64 S.Ct. at 680.

In *Amalgamated Meat Cutters & Butcher Workmen v. Connally*, 337 F.Supp. 737 (D.D.C.1971), a three–judge District Court considered the constitutionality of the delegation contained in the Economic Stabilization Act of 1970, Pub.L. No. 91–379, 84 Stat. 796 (1970). The Act authorized President Nixon to issue appropriate orders effectuating the stabilization of prices, rents, wages and salaries at levels less than those prevailing on May 25, 1970. The Act's delegation was standardless; [7] nevertheless the court sustained the Act against the claim of an improper delegation. 337 F.Supp. at 747–49. *Amalgamated Meat Cutters, supra*, is the culmination of the federal delegation cases; it assuredly indicates that with regard to delegation cases generally, the *Panama–Schechter* Doctrine is no more. *Amalgamated Meat Cutters, supra*, further ruled that the party who chooses to challenge Congress' choice of means for effecting its purpose shoulders the burden of persuasion which is met "[o]nly if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." 337 F.Supp. at 746 (quoting *Yakus v. United States*, 321 U.S. at 426, 64 S.Ct. at 668). A heavier burden is hard to imagine.

Where fundamental personal rights are involved, it appears that a stricter standard of review is required by the courts in evaluating legislative delegations. In *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Court reasoned that a delegation of lawmaking power to an administrative agency which affects a person's fundamental right to travel abroad must be reviewed by the courts under the appropriately strict standard. *Id.* at 129, 78 S.Ct. at 1119. Typically, this situation would arise where an agency is authorized to issue permits for exercising associational

---

7. One commentator stated with regard to this Act: "If ever there was a delegation without standards, this was it." B. Schwartz, *Administrative Law* § 18 at 46 (1976).

rights protected under the First Amendment; this would include activities akin to parades and demonstrations. *See Shuttlesworth v. Birmingham* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969).

In *Hander v. San Jacinto Junior College*, 325 F.Supp. 1019 (S.D.Tex.1971), Judge Bue noted that while general grants of power to administrative agencies are permissible to regulate many forms of activity, certain types of activities may only be regulated pursuant to the lawmaking functions of a legislature–particularly where the activity regulated concerns the public's "personal liberties." The District Court reasoned that "[i]f that power is delegated, then there must be acceptable standards included within that delegation so that the agency can follow the policy of the statute." *Id.* at 1021 (citing *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958)), *vacated*, 468 F.2d 619 (5th Cir. 1972). Essentially, Judge Bue's decision rests upon the premise that where "personal rights" are affected, the legislature must determine the basic policy of the law; it is the power to set *policy* that may not be delegated to an agency. 325 F.Supp. at 1021.

In the case before this Court, there are two distinct rationales for rejecting the plaintiffs' argument:

1. Congress did not delegate policy making power to the Secretary in § 3 of the Act; and

2. Even if § 3 delegates authority to the Secretary, it is not standardless under the applicable case law.

Section 3 of the BWCAW Act provides:

Sec. 3. The areas generally depicted as wilderness on the map entitled "Boundary Waters Canoe Area Wilderness and Boundary Waters Canoe Area Mining Protection Area" dated September 1978 comprising approximately one million and seventy–five thousand five hundred acres, are hereby designated as the Boundary Waters Canoe Area Wilderness (hereinafter referred to as the "wilderness"). Such designation shall supersede the designation of the Boundary Waters Canoe Area under section 3(a) of the Wilderness Act (78 Stat. 890) and such map shall supersede the map on file pursuant to such section. The map of the wilderness shall be on file and available for public inspection in the offices of the Supervisor of the Superior National Forest and of the Chief, United States Forest Service. The Secretary of Agriculture, hereinafter referred to as "The Secretary," shall, as soon as practicable but in no event later than one year after the date of enactment of this Act, publish a detailed legal description and map showing the boundaries of the wilderness in the Federal Register. Such map and description shall be filed with the Committee on Interior and Insular Affairs of the House of Representatives and the Committee on Energy and Natural Resources of the United States Senate. Such map and description shall have the same force and effect as if included in this Act. Correction of clerical and typographical errors in such legal description and map may be made.

§ 3 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649, 1650 (1978).

This section does two things. It establishes the boundaries of the Wilderness by reference to the map Congress had before it, and it directs the Secretary to publish a legal description and more practical map in the Federal Register.[8] This section also authorizes the Secretary to make clerical and typographical corrections with regard to any errors in the description and the map.

It seems clear that this section of the Act does not delegate any authority to the Secretary; it merely directs the Secretary to publish a map of the boundaries already established by reference in the Act. Congress has determined the boundaries; the

---

8. The map which Congress had before it stands 12 feet by 5 feet and is presently available for inspection in the U.S. Forest Service. *See* Affidavit of Robert V. Potter, *National Ass'n of Property Owners v. United States*, Doc. No. Civil 5–79–95 (D.Minn. filed Sept. 10, 1979).

Secretary's only duty outlined in § 3 is to *publish* the map of the boundaries.

If § 3 were construed as a delegation, as opposed to a plain congressional directive, it still remains that the section does not regulate "personal liberties"; accordingly the standard by which it must be judged is governed by *Yakus v. United States, supra,* and *Hander v. San Jacinto Junior College, supra.* Accordingly, such a delegation will be overturned *only* if this Court determines that it is *impossible* to ascertain whether the administrator's actions obey the will of Congress. I cannot conclude, by any stretch of the imagination, that § 3, if it delegates at all, delegates to the extent that it is impossible for the Secretary to perceive Congress' will.

b. *Plaintiffs' Equal Protection Claims Regarding the Handicapped and the Less Physically Fit*

■ Plaintiffs allege that § 4 of the Act, regulating the use of motorboats and snowmobiles in the Wilderness, is unconstitutional to the extent that it violates the Due Process Clause of the Fifth Amendment and the equal protection principles inherent in that constitutional guarantee;[9] and further that it infringes plaintiffs' Ninth Amendment rights.[10] Plaintiffs assert in the alternative that the 1978 Act conflicts with Title VI of the 1964 Civil Rights Act and the Vocational Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 701 *et seq.* (Supp.1980), and that this conflict necessitates a determination by this Court that § 4 can not be lawfully enforced. The Court finds that plaintiffs' ninth and tenth causes of action, raising these questions, fail to state claims for which relief may be granted, and, that as a matter of law, defendants and defendant–intervenors' motions for summary judgment must be granted.

Plaintiffs' claims necessitate a three–part analysis of the challenged section. First, is the end constitutional; is Congress empowered to pursue the legislative goals sought through § 4? Second, are the means chosen to effectuate these goals reasonably related to such a constitutionally permissible end; is there a rational basis for the means chosen by Congress? Third, does the challenged section violate another part of the Constitution?

It seems a matter well decided that Congress is constitutionally empowered to pursue the ends sought' to be achieved in the 1978 Act. Congress outlined these goals in § 2 of the Act; it sought to provide for such measures as would:

(1) provide for the protection and management of the fish and wildlife of the wilderness so as to enhance public enjoyment and appreciation of the unique biotic resources of the region,

(2) protect and enhance the natural values and environmental quality of the lakes, streams, shorelines and associated forest areas of the wilderness,

(3) maintain high water quality in such areas,

(4) minimize to the maximum extent possible, the environmental impacts associated with mineral development affecting such areas,

(5) prevent further road and commercial development and restore natural conditions to existing temporary roads in the wilderness, and

(6) provide for the orderly and equitable transition from motorized recreational uses to nonmotorized recreational

---

9. It is a matter well decided that the Due Process Clause of the Fifth Amendment embodies equal protection principles. *Mathews v. DeCastro,* 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 432 n. 1, 50 L.Ed.2d 389 (1976); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Ellis v. HUD,* 551 F.2d 13, 16 n. 9 (3rd Cir. 1977); *Counts v. United States Postal Serv.,* 17 FEP Cases 1161, 1163 (N.D.Fla.1978). *See also Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 95 S.Ct. 1225, 1230, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard,* 419 U.S. 498, 505–06, 95 S.Ct. 572, 576–577, 42 L.Ed.2d 610 (1975); *Johnson v. Robison,* 415 U.S. 361, 364 & n. 4, 94 S.Ct. 1160, 1164 & n. 4, 39 L.Ed.2d 389 (1974); *United States Dep't of Ag. v. Moreno,* 413 U.S. 528, 532–33 & n. 5, 93 S.Ct. 2821, 2824–2825 & n. 5, 37 L.Ed.2d 782 (1973).

10. Plaintiffs' Ninth Amendment claim is discussed at pp. 1246–1247, *infra.*

uses on those lakes, streams, and portages in the wilderness where such mechanized uses are to be phased out under the provisions of this Act.

§ 2 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649 (1978). Congress may constitutionally seek to achieve these goals; it may create and regulate Wilderness areas for recreational purposes for the public. *Izaak Walton League v. St. Clair*, 353 F.Supp. 698, 710 (D.Minn.1973), *rev'd on other grounds*, 497 F.2d 849 (8th Cir. 1974); *Parker v. United States*, 309 F.Supp. 593, 597–98 (D.Colo.1970), *aff'd* 448 F.2d 793, 795–96 (10th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972); *McMichael v. United States*, 355 F.2d 283, 286 (9th Cir. 1965). *See also United States v. Gregg*, 290 F.Supp. 706, 707–08 (W.D.Wash. 1968).

Judge Neville, in *St. Clair, supra*, characterized the mining prohibitions in the Wilderness Act of 1964 as something in the nature of a zoning regulation. Judge Neville stated: "This court is satisfied, if it can be said that Congress intended to bar all mineral activities in the BWCA, that it has the power and prerogative so to do." 353 F.Supp. at 707. The District Court reasoned that the "Wilderness purpose" is a public one, and that the congressional proscriptions and regulations there involved were reasonable. *Id.* Judge Neville concluded that "Congress clearly had the power to zone the BWCA in view of the public purpose to keep it virginal and untrammeled." 353 F.Supp. at 710.[11]

Accordingly, this Court determines that Congress has the *power* to designate the Boundary Waters as a Wilderness area, and to protect the "special qualities of the area as a natural forest–lakeland wilderness ecosystem". § 1 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649 (1978).

The Court further determines that the proscriptions enumerated in § 4 of the Act, prohibiting or otherwise restricting the use of motorized vehicles in the Wilderness are reasonably related to creating and protecting the wilderness qualities of the Boundary Waters Canoe Area. The provision in the Act regulating the use of motorboats and snowmobiles has a rational basis, and is reasonably related to a constitutionally permissible end.

Plaintiffs assert that § 4, which prohibits the use of motorized vehicles in the BWCAW, discriminates against the handicapped and the less physically fit in violation of the Due Process Clause of the Fifth Amendment and the equal protection principles inherent in that clause.

Practically, every statute discriminates in one way or another against some classes of people or infringes in some manner upon the rights or privileges of individuals or classes. For purposes of analysis, the Court must determine whether § 4 discriminates against any "suspect" classes, or whether it infringes any person's "fundamental" rights; only after this initial determination is made, can the Court choose the appropriate standard of review. This Court finds that the present case does not involve the aforementioned "suspect criteria."

Statutes which allocate burdens upon, or otherwise discriminate against, blacks as a racial group have always been "suspect," and subject to strict judicial scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). The number of "suspect classes" has grown in recent years to include other ethnic groups and aliens. *See Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194,

---

11. The Court of Appeals for the Eighth Circuit reversed Judge Neville's Order enjoining the defendants from engaging in mineral exploration in the BWCA. The Eighth Circuit affirmed the District Court's determination that Congress is empowered to enact such legislation. The basis for the reversal rested in the Appellate Court's determination that Congress did not intend to bar all mineral activity in the BWCA; the Court of Appeals ruled that the decision to issue mining permits for exploration in the Boundary Waters was left primarily with the Forest Service. The Eighth Circuit remanded the case to the District Court with directions to stay any further proceedings until after the Forest Service acted upon defendants' requests for permits to mine in the BWCA. *Izaak Walton League v. St. Clair*, 497 F.2d 849, 853–54 (8th Cir. 1974).

89 L.Ed. 194 (1944); *Graham v. Richardson,* 403 U.S. 365, 371–72, 91 S.Ct. 1848, 1851–1852, 29 L.Ed.2d 534 (1971). *See also Developments in the Law—Equal Protection,* 82 *Harv.L.Rev.* 1065, 1087–1127 (1969); Note, 11 *Creighton L.Rev.* 609, 611–16 (1977). *See generally* Gunther, *The Supreme Court, 1971 Term—Foreward; In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 *Harv.L.Rev.* 1 (1972).

■ Where a statute discriminates against one of these "suspect classes," it is subjected to strict review by the courts; judicial scrutiny under this standard requires that the challenged statute must further some compelling interest or be necessary to further an overriding purpose. *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). Few such statutes have survived this rigorous reviewing standard. *See Dunn v. Blumstein,* 405 U.S. 330, 363–64, 92 S.Ct. 995, 1013–1014, 31 L.Ed.2d 274 (1972) (Burger, C.J., dissenting).

■ The present case involves a situation where the handicapped and less physically fit are somewhat burdened by the restrictions of § 4. However, these classes of individuals are not "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). This Court finds that the individual members of these classes of people do not constitute a "discrete and insular minority." *See Johnson v. Robison,* 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 1169 n. 14, 39 L.Ed.2d 389 (1974). *See also Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). The handi-

capped are not a "suspect class." This Court is not the first to determine that physical disability is not a suspect class. *See Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973); *Carmi v. Metropolitan St. Louis Sewer District,* 620 F.2d 672 at 676 n. 9 (8th Cir. 1980); *Counts v. United States Postal Serv.,* 17 FEP Cases 1161, 1164 (N.D.Fla. 1978); *Vanko v. Finley,* 440 F.Supp. 656, 663 n. 14 (N.D.Ohio 1977). *See also Doe v. Colautti,* 592 F.2d 704, 710–11 (3d Cir. 1979). *See generally 2* Dorsen, Bender, Neuborne & Law, *Political & Civil Rights in the United States* (4th ed. 1979).[12]

Having determined that the Act does not impact upon any "suspect" classes of people, what remains to be determined is whether the Act infringes any "fundamental" rights. If neither suspect criteria are affected, then the Act must only pass a reasonableness test.

This Court determines that plaintiffs' right to utilize snowmobiles and motorboats in the Wilderness is not a "fundamental" right.[13] It is further determined that § 4 does not infringe any other fundamental rights possessed by these plaintiffs. Accordingly, the appropriate standard under which this section should be reviewed is the deferential rational basis standard. Under this standard, the challenged statute must be reasonable and not arbitrary, and will pass constitutional muster where any state of facts can reasonably be conceived that will sustain it, and the existence of such a state of facts must be presumed at the time of the enactment of the legislation. *See Graham v. Richardson,* 403 U.S. 365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534 (1971); *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393 (1961); *State Bd. of Tax Comm'rs v. Jackson,* 283 U.S. 527, 537, 51 S.Ct. 540, 543, 75 L.Ed. 1248 (1931); *Rast v. Van Deman & Lewis Co.,* 240 U.S. 342, 357, 36 S.Ct. 370, 374, 60 L.Ed. 679 (1916). *See generally*

---

**12.** Having determined that the physically disabled are not accorded special treatment, it follows that the less physically fit—the out-of-shape—are accorded even less protection from the majoritarian political process.

**13.** *See* discussion at pp. 1246–1247, *infra.*

*Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–341, 55 L.Ed. 369 (1911); *Developments in the Law–Equal Protection*, 82 Harv.L.Rev. 1065, 1077–87 (1969).

■ The plaintiffs bear the burden of establishing that § 4 does not pass the rational basis test. *Lindsley v. Natural Carbonic Gas Co., supra*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–341, 55 L.Ed. 369. Plaintiffs in the instant case have not cleared this hurdle; this Court finds that the Act's restrictions prohibiting, or otherwise regulating, the use of motorized vehicles in the Wilderness is reasonably related to the purpose of the 1978 Act, which is to create a Wilderness area and otherwise protect and enhance the natural value and environmental quality of the BWCAW. *See* § 2 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649 (1978). Accordingly, plaintiffs' equal protection claim must fail, and as a matter of law, summary judgment must be entered in favor of defendants and defendant–intervenors.[14]

c. *Plaintiffs' Claims Challenging §§ 4 and 5 of the Act on Ninth and Fifth Amendment Grounds*

(1) *Plaintiffs' § 4 Challenge*

Plaintiffs assert that § 4 of the BWCAW Act, regulating the use of motorboats and snowmobiles in the Wilderness infringes certain personal rights constitutionally guaranteed them through the Ninth and Fifth Amendments. Section 4 of the Act provides:

Administration

Sec. 4. (a) The Secretary shall administer the wilderness under the provisions of this Act, the Act of January 3, 1975 (88 Stat. 2096; 16 U.S.C. 1132 note), the Wilderness Act of 1964 (78 Stat. 890, 16 U.S.C. 1131–1136), and in accordance with other laws, rules and regulations generally applicable to areas designated as wilderness.

(b) Paragraph (5) of section 4(d) of the Wilderness Act of 1964 is hereby repealed and paragraphs (6), (7), and (8) of such section 4(d) are hereby redesignated as paragraphs (5), (6), and (7).

(c) Effective on January 1, 1979, the use of motorboats is prohibited within the wilderness designated by this Act, and that portion within the wilderness of all lakes which are partly within the wilderness, except for the following:

(1) On the following lakes, motorboats with motors of no greater than twenty–five horsepower shall be permitted: Fall, Lake County; Newton, Lake County; Moose, Lake County; Newfound, Lake County; Sucker, Lake County; Snowbank, Lake County; East Bearskin, Cook County; South Farm, Lake County; Trout, Saint Louis County; Basswood, except that portion generally north of the narrows at the north end of Jackfish Bay and north of a point on the international boundary between Ottawa Island and Washington Island; Saganaga, Cook County, except for that portion west of American Point; *Provided* : That, on the following lakes, until January 1, 1984, the horsepower limitations described in this paragraph shall not apply to towboats registered with the Secretary: Moose, Lake County; Newfound, Lake County; Sucker, Lake County; Saganaga, Cook County, as limited in this paragraph.

(2) On the following lakes and river, motorboats with motors no greater than ten horsepower shall be permitted: Clearwater, Cook County; North Fowl, Cook County; South Fowl, Cook County; Island River, east of Lake Isa-

---

**14.** Plaintiffs also assert that § 4 violates Title VI of the 1964 Civil Rights Act and § 504 of the Vocational Rehabilitation Act of 1973 as it denies handicapped persons of the benefits of a federally assisted program. The answer to this challenge is twofold. First, as described above, § 4 does not deny handicapped persons of the benefits of the Wilderness area; it preserves those benefits. Second, a statute cannot violate another statute. If a conflict exists, the more specific statute or, alternatively, the one latter in time, governs. Accordingly, this contention does not state a claim. *See* discussion at p. 1251, *infra*.

bella, Lake County; Sea Gull, that portion generally east of Threemile Island, Cook County; Alder, Cook County; Canoe, Cook County.

(3) On the following lakes, or specified portions of lakes, motorboats with motors of no greater than ten horsepower shall be permitted until the dates specified: Basswood River to and including Crooked Lake, Saint Louis and Lake Counties, until January 1, 1984; Carp Lake, the Knife River, and Knife Lake, Lake County, until January 1, 1984; Sea Gull, Cook County, that portion generally west of Threemile Island, until January 1, 1999; Brule, Cook County, until January 1, 1994, or until the termination of operation of any resort adjacent to Brule Lake in operation as of 1977, whichever occurs first.

(4) On the following lakes, or specified portions of lakes, motorboats with motors of no greater than twenty-five horsepower shall be permitted until January 1, 1984: Birch, Lake County; Basswood, Lake County, that portion generally north of the narrows at the north end of Jackfish Bay and north of a point on the international boundary between Ottawa Island and Washington Island.

(d) The detailed legal description and map to be published pursuant to section 3 of this Act shall contain a description of the various areas where the motorized uses permitted by this section are located. No provision of this section shall be construed to limit mechanical portages or the horsepower of motors used on motorboats in the following areas within the wilderness:

Little Vermilion Lake, Saint Louis County; Loon River, Saint Louis County; Loon Lake, Saint Louis County; that portion of the Lac La Croix, Saint Louis County, south of Snow Bay and east of Wilkins Bay.

(e) For the purposes of this Act, a snowmobile is defined as any motorized vehicle which is designed to operate on snow or ice. The use of snowmobiles in the wilderness designated by this Act is not permitted except that the Secretary may permit snowmobiles, not exceeding forty inches in width, on (1) the overland portages from Crane Lake to Little Vermilion Lake in Canada, and from Sea Gull River along the eastern portion of Saganaga Lake to Canada, and (2) on the following routes until January 1, 1984:

Vermilion Lake portage to and including Trout Lake; Moose Lake to and including Saganaga Lake via Ensign, Vera and Knife Lakes, East Bearskin Lake to and including Pine Lake via Alder Lake and Canoe Lake.

In addition to the routes listed above, the Secretary may issue special use permits for the grooming by snowmobiles of specified cross-country ski trails for day use near existing resorts.

(f) The Secretary is directed to develop and implement, as soon as practical, entry point quotas for use of motorboats within the wilderness portions of the lakes listed in subsection c, the quota levels to be based on such criteria as the size and configuration of each lake, and the amount of use on that lake: *Provided,* That the quota established for any one year shall not exceed the average actual annual motorboat use of the calendar years 1976, 1977, and 1978 for each lake, and shall take into account the fluctuation in use during different times of the year: *Provided further,* That on each lake homeowners and their guests and resort owners and their guests on that particular lake shall have access to that particular lake and their entry shall not be counted in determining such use.

(g) Nothing in this Act shall be deemed to require the termination of the existing operation of motor vehicles to assist in the transport of boats across the portages from Sucker Lake to Basswood Lake, from Fall Lake to Basswood Lake, and from Lake Vermilion to Trout Lake, during the period ending January 1, 1984. Following said date, unless the Secretary determines that there is no feasible nonmotorized means of transporting boats

across the portages to reach the lakes previously served by the portages listed above, he shall terminate all such motorized use of each portage listed above.

(h) The motorized uses authorized by this section shall be confined to those types of snowmobiles, motorboats and vehicles which have been in regular use in the Boundary Waters Canoe Area prior to the date of enactment of this Act. The Secretary may set forth additional standards and criteria to further define the type of motorized craft which may be permitted.

(i) Except for motorboats, snowmobiles, and mechanized portaging, as authorized and defined herein, no other motorized use of the wilderness shall be permitted. Nothing in this Act shall prohibit the use of aircraft, motorboats, snowmobiles, or other mechanized uses in emergencies, or for the administration of the wilderness area by Federal, State, and local governmental officials or their deputies, only where the Secretary finds that such use is essential.

§ 4 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649, 1650–52 (1978). Essentially, this section prohibits the use of motorboats and snowmobiles except on specifically enumerated lakes and snowtrail routes. This section regulates the number and horsepower size of motorboats where specifically allowed, and permits snowmobile use only where the machine's width is 40″ or less.

### (i) *The Ninth Amendment*

■ The Ninth Amendment to the Constitution of the United States provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S.Const. amend. IX. This Amendment has never been used as a solid basis for any decision from the Supreme Court. The Ninth Amendment was heralded as one of several sources from which a constitutionally protected privacy zone emanated. *See Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965).

Mr. Justice Goldberg, concurring in *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965), reasoned that: "[t]he Ninth Amendment shows a belief of the Constitution's authors that *fundamental* rights exist that are not expressly enumerated in the first eight amendments and an intent that the list of rights included there not be deemed exhaustive." 381 U.S. at 492, 85 S.Ct. at 1686. (emphasis added).

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court reviewed the "privacy" cases noting that there exists some zone of privacy within which reside several constitutionally protected rights; these rights, although not specifically enumerated in the Bill of Rights, are nonetheless deserving of special protection. *Id.* at 152–53, 93 S.Ct. at 726–727. *Roe, supra,* however, reasoned that "only personal rights that can be deemed 'fundamental,' or 'implicit' in the concept of ordered liberty, are included in this guarantee of personal privacy." *Id.* at 152, 93 S.Ct. at 726, (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). *See also Roe v. Wade,* 314 F.Supp. 1217 (N.D.Tex.1970).

To the extent that anything is clear about this Amendment, it seems apparent that only "fundamental" rights are somehow protected. Accordingly, if plaintiffs are entitled to any protection by the Ninth Amendment, it is forthcoming only to the extent that plaintiffs' "fundamental" rights are infringed.

■ In the instant case, the rights alleged to be infringed are plaintiffs' rights to operate motorboats and snowmobiles in the Wilderness. There are not many rights which have been considered "fundamental" by the Supreme Court; these special rights include: 1) the right to interstate travel, *Shapiro v. Thompson,* 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969); 2) the right to procreate, *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); 3) the right to choose a safe method of contraception, *Eisenstadt v. Baird,* 405 U.S. 438, 453–54, 92 S.Ct. 1029,

1038–1039, 31 L.Ed.2d 349 (1972); 4) the right to marry, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); and 5) the right to childrearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). *See generally Roe v. Wade*, 410 U.S. at 152–53, 93 S.Ct. at 726–727; Note, 11 *Creighton L.Rev.* 609, 612–13 (1977). Furthermore, the Court has indicated that the "fundamental personal rights" language in *Roe, supra*, should not be liberally construed. *See San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 29–34, 93 S.Ct. 1278, 1294–1297, 36 L.Ed.2d 16 (1973). Neither plaintiffs' counsel nor the Court have been successful in securing case law supporting the proposition that the right to operate motorboats and snowmobiles is fundamental. This Court determines that the right to operate motorized vehicles in the Wilderness is not fundamental. Accordingly, plaintiffs' Ninth Amendment claims, as a matter of law, must fail; defendants' and defendant–intervenors' motions for summary judgment with regard to plaintiffs' Ninth Amendment claims are granted.

### (ii) *The Fifth Amendment*

Plaintiffs' Fifth Amendment challenge essentially raises the question whether the 1978 Act, regulating the use of motorboats and snowmobiles, infringes plaintiffs' substantive due process rights. There are certain personal rights, not specifically enumerated in the Constitution, which are considered "the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Palko v. Connecticut*, 302 U.S. 319, 328, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937). Traditionally, the Supreme Court, where it has sought to protect these unenumerated constitutional rights, has grounded the basis of such protection in the Due Process Clause. *See generally Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); *Griswold v. Connecti-*

*cut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

 The Due Process Clause, however, demands strict judicial scrutiny only where a person's "fundamental" rights are infringed by congressional action. This Court has already determined that the right to use motorboats and snowmobiles in the Wilderness is not a fundamental right. *See* discussion at page 1246, *supra*. Accordingly, the standard by which this section must be reviewed is a "reasonableness" test. The question which this Court must consider is whether the legislation is reasonably related to a constitutional end.

 The manner which Congress chooses to effectuate its constitutionally permissible goals is not a matter demanding strict review by the courts unless persons' fundamental rights are adversely affected by these congressional means. This Court must only consider whether the "motor" ban is reasonably related to effectuating Congress' intention to turn the BWCA into a Wilderness area. This Court finds that the motorboat and snowmobile restrictions are reasonable, and that they further an otherwise constitutionally permissible goal. *See McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393 (1961); *Williamson v. Lee Optical Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–341, 55 L.Ed. 369 (1911). Accordingly, plaintiffs' Fifth Amendment claims must fail, and defendants' and defendant–intervenors' motions for summary judgment are granted.

### (2) *Plaintiffs' § 5 Challenge*

 Plaintiffs allege as their sixth, seventh, and eighth causes of action that § 5 of the Act operates as an encumbrance upon plaintiffs' property, infringing their right to own, control, and dispose of property in violation of the Fifth and Ninth Amendments. They claim further that § 5(c)'s reoffer provision is vague and constitutes a

taking in the constitutional sense. Finally, plaintiffs allege that § 5(b), allowing resort owners to retain a three–acre homestead does not rest upon a rational basis. Plaintiffs' amended complaint alleges that the fact that the term "Resort" is not defined in the Act constitutes a deprivation of plaintiffs' procedural due process rights; that Congress' choice of lakes to which this section applies does not rest upon a rational basis; that the triggering mechanism for the government's right of first refusal constitutes an unlawful delegation; and that to the extent that § 5(c) constitutes a "taking," the Act does not provide for adequate notice to all affected landowners.

Section 5 of the BWCAW Act provides:

### Resorts

Sec. 5. (a) The owner of a resort in commercial operation during 1975, 1976 or 1977 and located on land riparian to any of the lakes listed below may require purchase of that resort, including land and buildings appurtenant thereto, by written notice to the Secretary prior to September 30, 1985. The value of such resort for purposes of such sale shall be based upon its fair market value as of July 1, 1978, or as of the date of said written notice, whichever is greater, without regard to restrictions imposed by this Act:

Fall, Lake County, Moose, Lake County, Snowbank, Lake County, Lake One, Lake County, Sawbill, Cook County, Brule, Cook County, East Bearskin, Cook County, Clearwater, Cook County, Saganaga, Cook County, Sea Gull, Cook County, McFarland, Cook County, North Fowl, Cook County, South Fowl, Cook County, Jasper Lake, Lake County, Ojibway, Lake County.

(b) An owner requiring purchase of a resort under this provision may elect to retain one or more appropriate buildings and lands not exceeding three acres, for personal use as a residence: *Provided,* That the purchase price to the government for a resort shall be reduced by the fair market value of such buildings and lands, with the same valuation procedures outlined above.

(c) With respect to any privately owned lands and interests in lands riparian to the lakes listed above, and if the Federal Government has been required to purchase a resort on said lake, said lands shall not be sold without first being offered for sale to the Secretary who shall be given a period of one hundred days after the date of each such offer within which to purchase such lands. No such lands shall be sold at a price below the price at which they have been offered for sale to the Secretary, and if such lands are reoffered for sale they shall first be reoffered to the Secretary: *Provided,* That, this right of first refusal shall not apply to a change in ownership of a property within an immediate family.

(d) There are authorized to be appropriated such sums as may be necessary for the acquisition of lands and interests therein as provided by this section.

§ 5 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649, 1652 (1978).

This provision, essentially, allows certain qualified resort owners to force a sale of their property to the Secretary at fair market value. It also permits the resort owners to retain a three–acre homestead if they are so inclined. Section 5(c) provides that where a resort owner has forced a sale on any of the qualifying lakes, then the remaining privately owned lands on that lake may not be sold to another purchaser unless the Secretary has first been offered the opportunity to purchase such lands. The Secretary has 100 days to exercise this right of first refusal. Further, if the landowner reoffers the land at a price lower than what was first offered to the Secretary, then the Secretary is, again, given right of first refusal as to the reoffer.

Plaintiffs' allegation raising Ninth Amendment claims must fail for failure to state a claim upon which relief may be granted. As discussed previously, the Ninth Amendment extends the shield of constitutional protection only so far as to cover unenumerated "fundamental" rights. The Court has indicated that there are not

many rights which have been provided special protection as fundamental and implicit in the nature of ordered liberty. This Court is reluctant to determine that the plaintiffs' right to dispose of their property without any governmental interference is fundamental and within the ambit of the Ninth Amendment's protection, particularly where another provision of the Constitution has traditionally been raised as an appropriate protector. It seems apparent to this Court that to the extent the operation of § 5 constitutes an encumbrance upon plaintiffs' right to own and dispose of their property, the Takings Clause of the Fifth Amendment may more properly be invoked to redress plaintiffs' injury.[15]

Plaintiffs allege that since the government's right of first refusal does not arise until after a qualifying resort owner forces a sale of a qualifying resort, the determination to "take" rests in the discretion of the private citizen, and not the federal government. Plaintiffs assert that this triggering mechanism constitutes an unlawful delegation to a private citizen.

The Court has previously discussed the Delegation Doctrine,[16] determining essentially that so long as the Legislature determines the basic policy of the law, any further delegation regarding its application is permissible. *See Hander v. San Jacinto Junior College*, 325 F.Supp. 1019, 1021 (S.D. Tex.1971). It is clear that Congress determined the basic policy of § 5; it is only the triggering of the policy that turns upon the private resort owner's decision to force a sale under § 5(a). Further, it seems apparent that no delegation is even contemplated by § 5 of the Act. Once a qualifying resort owner forces a sale under this provision, the "right" of first refusal is triggered. With regard to whether the Secretary intends to

exercise its right, the private resort owner has neither interest nor input. The determination to purchase under this right of first refusal is delegated to no one.

Plaintiffs also allege that § 5 infringes their Fifth Amendment rights; they base their complaint upon the Due Process Clause and the Takings Clause. Plaintiffs' claim that the three–acre homestead provision does not rest upon a rational basis is untenable; a major concern of the sponsors of the compromise bill that became the 1978 Act was the welfare of the local residents. The Act was drafted in such a manner as to assist the local population in adjusting to any inconveniences occasioned by the new legislation; § 5(b) is a paradigm example of how Congress sought to accommodate those persons specifically impacted by the new Act.

In accordance with the Act's new management plan, the local resort owners may elect to force a sale of their resorts under § 5(a).[17] Congress determined that rather than force these owners to leave the area completely, they should be given the opportunity to retain a three–acre homestead if they so choose to elect. By preventing the wholesale uprooting of these owners, § 5(b) carries out the Act's objective of providing a smooth transition for local residents to the new management plan of the BWCAW. Accordingly, § 5(b) is rationally related to a permissible congressional goal.

Plaintiffs' amended claim alleging that Congress' selection of the lakes to which § 5(a) applies is arbitrary and capricious fails to state a claim for relief as well and, further, falls pursuant to the defendants' and defendant–intervenors' motions for summary judgment. The fifteen lakes listed in § 5(c) are those lakes upon which the new motor restrictions either attach or im-

---

15. *See* discussion of the Takings Clause at pp. 1249-1251 *infra*.

16. *See* discussion at pp. 1239–1241 *supra*.

17. With regard to plaintiffs' claims that the Act does not define "resorts" and, accordingly, does not treat property owners fairly, the simple answer is that presently no plaintiff has come forward and claimed that he has ap-

proached the federal government pursuant to § 5 and that the government has told him his property is not a "resort." If one does, and is rebuffed by the government, he may have an action, but his action is simply one to determine whether or not his property is a "resort" subject to § 5's provisions; he does not have an action to declare the Act unconstitutional.

pact, as well as those lakes upon which resorts had long past made a practice of storing boats for use by their customers–a practice now banned by the new Act. These lakes were selected by Congress to facilitate an orderly transition for impacted resort owners to the new management plan for the Wilderness. Accordingly, § 5(c) is rationally related to a permissible congressional purpose, and rests upon a rational basis.

Plaintiffs' claim regarding the Takings Clause of the Fifth Amendment raises some serious concerns with the Court. Plaintiffs essentially argue that the triggering mechanism of § 5(c) constitutes an encumbrance upon the impacted landowners' title to their property, and that such a restraint on alienation constitutes a "taking" in the constitutional sense.

 The United States is empowered to "take" private property when such action is reasonably related to its other powers. *See Kohl v. United States,* 91 U.S. (1 Otto) 367, 372, 23 L.Ed. 449 (1875). The fundamental inquiry in "taking" jurisprudence concerns:

(1) whether the particular governmental intrusion is for a public purpose; and

(2) whether such regulation of private lands goes so far that it must be considered a "taking" in the constitutional sense, and therefore deemed invalid unless compensation is provided.

*See Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 78–80, 57 S.Ct. 364, 375–376, 81 L.Ed. 510 (1937); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). *Cf. Tennessee Valley Authority v. Welch,* 327 U.S. 546, 551, 66 S.Ct. 715, 717, 90 L.Ed. 843 (1946); *Berman v. Parker,* 348 U.S. 26, 32–36, 75 S.Ct. 98, 102–104, 99 L.Ed. 27 (1954). *See generally* Tribe, *American Constitutional Law* § 9–2 at 458 & n. 10 (1978).

With regard to the first inquiry, this Court determines that § 5(c)'s triggering mechanism is reasonably related to the permissible congressional goal of facilitating an orderly transition for local landowners to the new Wilderness management scheme embodied in the 1978 Act. Congress had ample basis upon which to determine that the BWCA's metamorphosis into a Wilderness Park surely benefits the public. With regard to the second inquiry, it must be noted that what constitutes "going too far" is a problem which needs be determined on a case by case basis. The Court clearly contemplates that § 5(c) may operate to restrict the ability of many landowners to transfer or otherwise alienate their property. Section 5(c) will in all probability create a cloud on some landowners' titles and accordingly diminish the value of their property holdings. This diminution in value, where shown, is a taking; nothing in this Order will operate to restrict such a landowner–or a class of similarly situated landowners–from initiating an action in the form of an inverse condemnation proceeding and proving up damages occasioned by a taking or takings.[18]

---

**18.** It would seem that any impacted landowner could pursue this method for relief immediately after the government acquires a qualifying resort; the mere acquisition triggers the right of first and second refusal, and it is this refusal right that may operate to cloud a property owner's title.

The issue of what constitutes a "taking" is a question governed by federal law; what constitutes "property" within the meaning of the Fifth Amendment is governed by state law. *Johnson v. United States,* 479 F.2d 1383, 1390, 202 Ct.Cl. 405 (1973). The Minnesota Supreme Court has ruled that a zoning ordinance which adversely affects a landowner's ability to alienate his property at any place and at any time is a property right which cannot be materially interfered with without just compensation. *Sanderson v. City of Willmar,* 282 Minn. 1, 5–7, 162 N.W.2d 494, 497–98 (1968).

The Court contemplates that the effect of § 5(c) may constitute a major impairment of plaintiffs' right to sell their property to anyone at any price they see fit. This Order does not restrict any such impacted landowner from instituting an inverse condemnation proceeding in the future, establishing that the right which he has to sell his property is significantly impaired, and proving up just compensation. The nature and extent of plaintiffs' loss must be determined on a case by case basis. If in such a case it is determined that the governmental intrusion is substantial and goes so far as to constitute a taking in the constitutional sense, then the owner so imposed may demand com-

There are presently no landowners styled as plaintiffs in this case who raise takings claims by the operation of § 5(c). Accordingly, the question of just compensation need not be addressed here. The Court will reserve its opinion on this matter until an impacted landowner is actually before it, mindful that compensation is not constitutionally permissible until one of the landowners actually harmed by this statute initiates a lawsuit on his own behalf and proves up a taking claim.

These plaintiffs' takings claims fail to state a claim upon which relief may be granted. Accordingly, defendants' and defendant–intervenors' motions for summary judgment are granted; therefore plaintiffs' sixth and seventh causes of action are dismissed.[19]

#### d. Plaintiffs' Claim Regarding the Webster–Ashburton Treaty of 1842

 Plaintiffs allege that the implementation of the 1978 Act would directly conflict with the Webster–Ashburton Treaty of 1842. Even presuming for the sake of argument that the challenged statute and the 1842 Treaty conflict, this claim does not state a cause of action for which a remedy is available. It is clear beyond doubt that where a later piece of legislation conflicts with an earlier enacted treaty, the statute controls. See The Chinese Exclusion Case,

130 U.S. 581, 600, 9 S.Ct. 623, 627, 32 L.Ed. 1068 (1889). Whitney v. Robertson, 124 U.S. 190, 195, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); Head Money Cases, 112 U.S. 580, 599, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884). See also United States v. Postal, 589 F.2d 862, 878–79 n. 25 (5th Cir. 1979). See generally Gunther, Constitutional Law, Cases and Materials at 273 note (9th ed. 1975).

The United States Supreme Court has never abrogated the rule articulated in The Chinese Exclusion Case, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). There, Mr. Justice Field reasoned:

> If the treaty operates by its own force, and relates to a subject within the power of Congress, it can be deemed in that particular only the equivalent of a legislative act, to be repealed or modified at the pleasure of Congress. In either case, the last expression of the sovereign will must control.

Id. at 600, 9 S.Ct. at 628. See also Moser v. United States, 341 U.S. 41, 45 & n. 9, 71 S.Ct. 553, 555 & n. 9, 95 L.Ed. 729 (1951); Clark v. Allen, 331 U.S. 503, 508, 67 S.Ct. 1431, 1434, 91 L.Ed. 1633 (1947); Diggs v. Shultz, 470 F.2d 461, 465–66 & n. 4 (D.C.Cir. 1972).

Accordingly, plaintiffs' fifth cause of action as a matter of law must fail; defendants' and defendant–intervenors' motions for summary judgment are granted.[20]

---

pensation for the lessened value of his property.

This Order, likewise, does not restrict the government from initiating its own condemnation proceedings and acquiring any property in this manner.

**19.** Plaintiffs also allege in their seventh cause of action that under the bare language of the statute the right of second refusal is indefinite and that such a fact in and of itself raises a taking claim. The United States has indicated that it construes the second refusal right no less limited in duration than its right of first refusal, to wit, 100 days. This Court deems that such a reading of the statute is not only reasonably warranted, but constitutionally necessary. In any event, until a proper party plaintiff is before this Court, the issue of a constitutional taking cannot be finally resolved. Likewise, plaintiffs' claim regarding proper notice under § 5 is premature and need not be addressed at this time.

**20.** Plaintiffs' fifth cause of action further claims that § 17 of the Act conflicts with the Supremacy Clause of Article VI of the United States Constitution and that § 17 infringes plaintiffs' right to travel. These claims are likewise dismissed for failure to state a claim for relief. Plaintiffs claim a constitutional right to travel in and around the BWCAW, and internationally. The 1978 Act, however, does not deny them their right to travel throughout the Wilderness; it merely regulates the manner of travel. The historical methods of travel in the Wilderness are available to these plaintiffs; the Act does not flat out prohibit all modes of travel in the BWCAW. Courts have upheld reasonable restrictions on movement as constitutionally permissible. See, e. g., Mathews v. Diaz, 426 U.S. 67, 86 n. 26, 96 S.Ct. 1883, 1894 n. 26, 48 L.Ed.2d 478 (1976); United States v. Davis, 482 F.2d 893, 912–13 (9th Cir. 1973).

Plaintiffs' travel claim does not rise to a constitutional dimension. If the Court were to

**e.** *Plaintiffs' Selective Enforcement Claims*

Plaintiffs allege that the Forest Service, the agency chiefly responsible for enforcing the restrictions ordered in the new Act, has selectively enforced the proscriptions of the BWCAW Act. Plaintiffs assert that such selective enforcement gives rise to a viable equal protection claim on their behalf. The Court is not moved by plaintiffs' assertions.

■ Standing, essentially, is the requirement that a party seeking relief in the federal courts have "a sufficient stake in an otherwise justiciable controversy." *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). *See also Wampler v. Goldschmidt*, 486 F.Supp. 1130, 1133 (D.Minn.1980). The sufficiency of plaintiffs' stake turns upon two inquiries:

(1) Have plaintiffs alleged that the defendants' acts will cause them injury in fact; and

(2) Is the interest sought to be protected "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Org., Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). *See also Rodeway Inns of America, Inc. v. Frank*, 541 F.2d 759, 763–65 (8th Cir. 1976); *Wampler v. Goldschmidt, supra.*

■ Plaintiffs fail to satisfy the Article III requirement of alleging injury in fact. Plaintiffs allege as their eleventh cause of action that "[d]efendant's agent, the United States Forest Service, has cited one individual several times for alleged violations of the Act, while ignoring other alleged offenders. This manner of selective enforcement is violative of Plaintiff's Fifth Amendment equal protection rights ...."

This is the extent of plaintiffs' allegation; no named plaintiffs have been cited for violation of the new Act. No named plaintiffs have been.the subject of discriminatory enforcement.

The Supreme Court has addressed the question plaintiffs pose to this Court. In *Linda R. S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the Court stated that:

> The Court's prior decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution. See *Younger v. Harris*, 401 U.S. 37, 42 [, 91 S.Ct. 746, 749, 27 L.Ed.2d 669] (1971); *Bailey v. Patterson*, 369 U.S. 31, 33 [, 82 S.Ct. 549, 551, 7 L.Ed.2d 512] (1962); *Poe v. Ullman*, 367 U.S. 497, 501 [, 81 S.Ct. 1752, 1754, 6 L.Ed. 989] (1961). Although these cases arose in a somewhat different context, they demonstrate that, in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.

*Id.* at 619, 93 S.Ct. at 1149. No named plaintiffs have been prosecuted or threatened with prosecution.

Even if it were the case that these plaintiffs were the subject of discriminatory treatment in the Forest Service's enforcement of this Act, they could not prevail on this claim unless it were established that such selective enforcement is based upon some constitutionally impermissible ground such as race, religion, or the exercise of plaintiffs' first amendment guarantees. *Wheaton v. Hagan*, 435 F.Supp. 1134, 1148–49 (M.D.N.C.1977). *See also Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7

---

embrace this claim as feasible, it would be, in effect, challenging all restrictions on movement from speed limits to Coast Guard boat regulations. Plaintiffs' claims based upon the Supremacy Clause of the United States Constitution also fail to state a claim for relief. It is clear that where a state statute or municipal ordinance conflicts with a treaty, the conflict must constitutionally be resolved in favor of the treaty. *Asakura v. City of Seattle*, 265 U.S.

332, 341, 44 S.Ct. 515, 516, 68 L.Ed. 1041 (1924). *See generally* Gunther, *Constitutional Law, Cases and Materials*, at 272 (9th ed. 1975). However, to the extent that a later enacted statute conflicts with a treaty, the Supremacy Clause does not even come into the picture, and the latter will of Congress controls. *The Chinese Exclusion Case*, 130 U.S. 581, 600, 9 S.Ct. 623, 627, 32 L.Ed. 1068 (1889).

L.Ed.2d 446 (1962); *United States v. Peskin*, 527 F.2d 71, 86 (7th Cir. 1975); *United States v. Oaks*, 527 F.2d 937, 940 (9th Cir. 1976); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). Plaintiffs have neither argued nor even intimated that the Forest Service's alleged selective enforcement of the BWCAW Act is based upon these impermissible considerations.

These plaintiffs lack a sufficient enough stake in the controversy to satisfy Article III's injury in fact requirement. Accordingly, plaintiffs' eleventh cause of action is dismissed on the grounds that these plaintiffs lack standing to assert such a claim.

## THE SECOND CASE

B. *Minnesota v. Bergland*, Civ. 5–79–178

The parties have filed motions and cross motions for summary judgment in the instant case. After careful review of the entire file, all memoranda and counsel's oral presentation, the Court determines that the plaintiffs' and plaintiff–intervenors' motions are denied and the defendants' and defendant–intervenors' motions are granted.

### 1. *Facts*

Counsel have stipulated that for the purpose of disposing of the instant matter, the following constitutes the relevant and undisputed facts:

1. *Description of the Boundary Waters Canoe Area Wilderness*

1.1 *Surface Ownership.* The Boundary Waters Canoe Area Wilderness (BWCAW) is a part of the Superior National Forest in northeastern Minnesota. The total land and water area within the external boundaries of the BWCAW as established by Public Law 95–495 (1978 Act) is approximately 1,080,300 acres.[21] Approximately 792,000 acres of the land surface area within the external boundaries of the BWCAW are owned by the United States, approximately

121,000 acres of land surface area are owned by the State of Minnesota and various counties, approximately 7,300 acres of land surface area are privately owned, and approximately 160,000 acres are water area. The State of Minnesota owns the beds of navigable waters in the BWCAW. All of the waters listed in the 1978 Act are navigable.

1.2 *Mineral Interests.* The United States owns the mineral interests in approximately 44% of the area within the external boundaries of the BWCAW, the State of Minnesota owns the mineral interests in approximately 27% of the land and water areas, and in the remaining approximately 29%, the mineral interests are privately owned.

2. *History of Superior National Forest and BWCAW.*

2.1 *Original Withdrawals.* The history of the Superior National Forest begins May 10, 1902, with a letter from General C.C. Andrews, chief fire warden of Minnesota, to the Commissioner, General Land Office, Washington, D. C., recommending that certain federal lands be set aside as a forest reservation under applicable federal statutes. Immediate action was taken to withdraw certain lands from all forms of disposal under the public land laws. The first withdrawal, dated June 30, 1902, covered essentially all of the area described in General Andrews' letter totaling approximately 490,440 acres. The second withdrawal, dated August 18, 1905, covered approximately 141,000 acres. The third withdrawal, dated April 22, 1908, covered approximately 518,700 acres.

2.2 *Establishment.* On February 13, 1909, by Proclamation No. 848, President Theodore Roosevelt established the Superior National Forest by reserving from settlement or entry and setting apart as a public reservation, for the use and benefit of the people, all the tracts of land previously withdrawn from disposal. Additional lands

---

**21.** [Court's Note: Section 3 of the Act states that the Wilderness area comprises approximately 1,075,500 acres. The fact that counsel's stipulated facts differ in this regard presents no problem to the Court. Congress' approximation controls.]

were made a part of Superior National Forest by further reservations in 1912 by Proclamation Nos. 1196 and 1215, in 1926 by Proclamation No. 1800, in 1927 by Proclamation No. 4889, in 1932 by Proclamation No. 5833, in 1936 by Proclamation No. 2213, and in 1962 by Executive Order No. 11072. Lands were first acquired for addition to Superior National Forest pursuant to the Weeks law of 1911, Act of March 1, 1911, c. 186, 36 Stat. 961, 16 U.S.C. § 515.

2.3 *Carhart Report.* In 1922, the Carhart Report was prepared for the Department of Agriculture recommending that the one million acres of the Superior National Forest be administered to develop the recreational use of the area to protect and enhance its lakeland quality, avoiding urban type, man–made developments such as roads and residential units which would detract from the area.

2.4 *State Lakeshore Withdrawn From Sale.* In 1923, the Minnesota legislature adopted Minn. Stat. § 92.45 withdrawing from sale state lands bordering on meandered lakes and public waters and water courses, a substantial portion of which were located in the Superior National Forest area.

2.5 *Primitive Area Policy.* On September 17, 1926, the Secretary of Agriculture adopted a policy to set aside not less than 1,000 square miles of the Superior National Forest containing the best of the lakes and waterways to be kept as wilderness recreation areas. A primitive area policy was declared, the main provisions of which were (1) to retain as much wilderness as possible in association with the land having recreational opportunities, (2) to build no roads where the Forest Service exerts control, (3) to prevent commercial recreational developments, (4) to build simple campground facilities as needed to prevent escape of fire or protect sanitary conditions, and (5) to utilize the timber produced under careful methods of cutting that insure a continuous timber supply with preservation of natural scenery along lakeshores, adjacent to campgrounds, and similar areas.

2.6 *Water Development.* In the 1920's and early 1930's, state officers and administrators, among others, appeared before the International Joint Commission in opposition to the hydroelectric project (Backus plan) proposed for the area. In 1929, the Minnesota legislature adopted a concurrent resolution urging the Congress to adopt the Shipstead–Newton bill then pending. In 1930, the governor of Minnesota urged adoption of the bill to prevent exploitation of border waters by private interests.

2.7 *Shipstead–Nolan Act.* In 1930, Congress adopted the Shipstead–Nolan Act, which, *inter alia*, prohibited officials and commissions of the United States from granting any permit, license, lease or other authorization to further alter the natural water level of any lake or stream within or bordering upon the area now within the BWCAW, unless authorizations for each project were first obtained by special act of Congress. 16 U.S.C. §§ 577–577b.

2.8 *Little Shipstead–Nolan Act.* In 1933, the Minnesota legislature adopted the Little Shipstead–Nolan Act, (Minn. Stat. § 110.13), prohibiting the construction of any dam or addition to any existing dam in any public stream or body of water within or bordering the areas covered by the federal Shipstead–Nolan Act unless specifically authorized by the legislature.

2.9 *Quetico–Superior Committee.* On June 30, 1934, President Franklin Roosevelt established the Quetico–Superior Committee by Executive Order 6783 to consult and advise with the various federal departments and agencies concerned and with the State of Minnesota, and to make recommendations on the proposed establishment of a wilderness sanctuary in the area.

2.10 *Superior Roadless Primitive Area.* In 1939, the Chief of the Forest Service approved a proposal for the establishment of the Superior Roadless Primitive Area. In 1941, the Forest Service established the first timber no cut zones totaling approximately 362,000 acres near the international boundary.

2.11 *Thye–Blatnik Act.* In 1947, the Thye–Blatnik Act was introduced in Con-

gress to authorize the acquisition of additional lands within the roadless areas, and the Minnesota legislature adopted a resolution urging Congress to pass the Act. The Thye–Blatnik Act was adopted in 1948. 16 U.S.C. § 577c.

2.12 *Roadless Areas.* In 1948, the Forest Service established the Superior, Little Indian Sioux, and Caribou roadless areas in the Superior National Forest.

2.13 *State Air Ban.* In 1949, the Minnesota legislature designated the areas described in the Thye–Blatnik Act and the public waters therein or bordering thereon, with certain exceptions, as a wilderness area and authorized regulation and control of aircraft and watercraft. Minn. Stat. §§ 84.43–84.52. Prosecutions of violations of this Act were commenced in August of 1949, four months prior to the federal air ban. The state air ban was suspended in 1951 during the continuance of the federal air ban. Minn. Stat. § 84.521.

2.14 *Federal Air Ban.* Later in 1949, at the urging of Minnesota Governor Luther Youngdahl and Senator Hubert H. Humphrey, among others, President Harry S. Truman issued Executive Order No. 10092, 14 Fed. Reg. 7637 (Dec. 19, 1949), creating an airspace reservation below the altitude of 4,000 feet over the roadless areas.

2.15 *Humphrey–Thye–Blatnik–Andresen Act.* In 1956, Congress adopted the Humphrey–Thye–Blatnik–Andresen Act which extended the authority for the acquisition of additional lands in the area. 16 U.S.C. §§ 577d–1, 577g–1, 577h.

2.16 *Boundary Waters Canoe Area.* In 1958, the name of the roadless areas was changed to the Boundary Waters Canoe Area by the Department of Agriculture.

2.17 *Roads Closed.* In 1961, the Forest Service closed all roads on federal lands within the Boundary Waters Canoe Area to vehicular traffic.

2.18 *Wilderness Act.* In 1964, Congress adopted the Wilderness Act establishing a national wilderness preservation system to be composed of federally owned areas designated by Congress as wilderness areas.

National forest areas theretofore classified as "canoe" areas were designated as wilderness areas. With respect to the Boundary Waters Canoe Area, the Wilderness Act provided:

Other provisions of this chapter to the contrary notwithstanding, the management of the Boundary Waters Canoe Area, formerly designated as the Superior, Little Indian Sioux, and Caribou Roadless Areas, in the Superior National Forest, Minnesota, shall be in accordance with regulations established by the Secretary of Agriculture in accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams, and portages. Provided, That nothing in this chapter shall preclude the continuance within the area of any already established use of motorboats.

§ 4(d)(5) Wilderness Act, Pub.L. No. 88–577, 78 Stat. 895 (1964).

2.19 *Review Committee.* In 1964, the Secretary of Agriculture appointed the Boundary Waters Canoe Area Review Committee to review and make recommendations on the management of the area. The committee issued its report on December 15, 1964, recommending that the area be managed as a primitive type recreation area, and that the use of motorboats should be restricted by the establishment of three zones, a large motor zone, a small motor zone and a no motor zone. The large motor zone included all waters having road access from outside the canoe area. The small motor zone (4 horsepower proposed) included waters accessible by not more than one portage and the international boundary from Lac La Croix to Saganaga. Regulations adopted by the Secretary of Agriculture on December 16, 1965 implemented a portion of the recommendations of the review committee.

2.20 *State Water Regulation.* In 1970, the Minnesota Department of Natural Resources issued regulations (N.R. 1,000) regarding use of state lands and waters within the Boundary Waters Canoe Area.

2.21 *Mineral Exploration.* Since the late 1960's neither the United States nor the State of Minnesota has attempted to engage in mineral exploration in the BWCAW by drilling in the areas in which the respective governments own both surface and subsurface rights. The State of Minnesota has not issued any prospecting permits or mineral leases in the BWCAW, nor has it issued any permits to any other persons for roads across state lands, to cut state timber, to work in the beds of public waters, to appropriate public waters, or to use in any other manner, state–owned lands or waters in connection with private mineral exploration by drilling, nor has the state received any applications for permits to authorize such activities.

Between 1931 and 1945, permits for mining and removal of minerals on public domain lands in the Superior National Forest were granted by the Secretary of Agriculture pursuant to a ruling of the solicitor for the department, which ruling was overruled by the solicitor in 1944. Following a change in the federal statutes relating to mineral exploration in 1950, the federal government issued a small number of limited prospecting permits within the boundaries of the BWCA during the 1950's. All outstanding permits affecting lands in the BWCA were terminated in 1965 by the Secretary of Agriculture pursuant to the recommendations of the BWCA review committee.

During the year 1969, the owner of mineral leases covering areas within the BWCA undertook surface mineral exploration within the BWCA with the knowledge and consent of the United States Forest Service. A base camp and several temporary encampments were set up within the BWCA by geologists who moved by canoe throughout the area. During the summer of 1969, the Forest Service permitted the mineral lease owner to enter the BWCA for purposes of surface exploration, using hand tools and visual observation, and authorized the establishment of a base camp for a period exceeding 14 days. After cessation of active exploration in September 1969, removal of the equipment was requested, but storage of the equipment at the campsite was continued without objection. In December 1969, the supervisor of the Superior National Forest was notified by letter that the owner of the mineral leases planned core drilling with the use of mechanical equipment and permanent camps.

Litigation was commenced by the Izaak Walton League of America against the owner of the mineral leases, the State of Minnesota, and the United States Department of Agriculture, the state cross–claimed against the owners and the federal defendants and requested a temporary restraining order to block further exploration. United States District Judge Phillip Neville ruled that the mineral exploration was illegal. The ruling was reversed by the Court of Appeals on jurisdictional grounds, further exploration was prohibited without a permit from the Forest Service, and the exploration was terminated and has not been renewed to date. *See, Izaak Walton League of America v. St. Clair,* 353 F.Supp. 698 (D.Minn.1973), *rev'd* 497 F.2d 849 (8th Cir. 1974), *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974). *See also Izaak Walton League of America v. St. Clair,* 313 F.Supp. 1312 (D.Minn.1970); 55 F.R.D. 139 (D.Minn.1976).

2.22 *State BWCA Act.* In 1976, the Minnesota legislature enacted Minn. Stat. § 84.523 which provides, *inter alia* :

Subdivision 1. Definition. For the purposes of this section, the term "boundary waters canoe area" means that area of lands and waters included within the boundaries designated in federal regulations REG U–3, 36 Code of Federal Regulations 293.16, as that regulation provided on January 1, 1975.

Subd. 2. Intent. The legislature finds that a combination of state legislative and administrative actions and court decisions have established a public policy of primarily wilderness management for state lands and waters within the boundary waters canoe area. This state policy, together with a similar federal policy and international actions consistent with

these state and federal ... policies, has created an area of hundreds of thousands of acres of land and water containing myriad lakes and streams, wooded shores, virgin forests, and other natural attractions of surpassing scenic beauty and solitude, free from substantially all commercial activities and artificial development such as hydroelectric dams and power lines, resorts, roads, sawmills, and timber harvesting in no–cut zones.

Subd. 3. Mining; prohibition. Except with the prior approval of the legislature in those cases of national emergency which have been declared by the Congress and which direct the need for exploration and mining of federal lands within the boundary waters canoe area, and after an investigation and determination by the commissioner of natural resources pursuant to subdivision 5 no state owned or administered land may be leased for exploration or mining of minerals, and no state permits, licenses or leases shall be issued to use any other state natural resources for any mineral exploration or mining operations in the boundary waters canoe area.

Minn. Stat. § 84.523.

2.23 *Snowmobile Ban.* In September 1976, the Secretary of Agriculture affirmed a decision of the Chief of the Forest Service banning the use of snowmobiles in the BWCA.

2.24 *Motorboat Restrictions.* In 1977, the Regional Forester issued an order pursuant to the regulations of the Secretary restricting the use of the BWCA. *See* 36 C.F.R. §§ 261.17 and 293.16 (1979).

3. *Legislative History of the 1978 Act.*

3.1 *State Participation.* Following the introduction of legislation in Congress which ultimately led to the adoption of the 1978 Act, officials of the State of Minnesota actively participated in the legislative process and communicated their views orally and in writing to various members of Congress. The State of Minnesota was not permitted to participate in the negotiations in July 1978 leading to the "Dayton–Walls" compromise.

3.2 *Section 15 BWCAW Act.* Section 15 of the 1978 Act provides, in part:

The Secretary is authorized to promulgate and enforce regulations that limit or prohibit the use of motorized equipment on or relating to waters located within the wilderness in accordance with the provisions of this Act: Provided, That nothing in this Act shall be construed as affecting the jurisdiction or responsibilities of the State with respect to such waters except to the extent that the exercise of such jurisdiction is less stringent than the Secretary's regulations promulgated pursuant to this section: Provided further, That any regulations adopted pursuant to this Act shall be complementary to, and not in derogation of regulations issued by the United States Coast Guard.

§ 15 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649, 1657 (1978).

The language of Section 15 was included in H.R. 12250, introduced on April 20, 1978, and in Senate Bill S. 3242 introduced on June 23, 1978. (Section 15 as finally enacted appears as Section 14 in S. 3242). The report of the House Committee on Interior and Insular Affairs on H.R. 12250 dated May 4, 1975, states:

Section 15 authorizes the Secretary to issue and enforce regulations regarding motorized equipment on waters in the wilderness and recreation area. The state jurisdiction over these waters is to remain entirely unaffected, except where the exercise of that jurisdiction would be less stringent than the federal regulations promulgated to restrict motorized use. Any regulations adopted by the Secretary are not to conflict with the United States Coast Guard regulations. The Secretary may also enter into a cooperative agreement with the State of Minnesota for enforcement of various regulations.

*Legislative History* at 83.

The report of the Senate Committee on Energy and Natural Resources on the Senate Bill S. 3242, on October 4, 1978, states:

Both versions make it clear that nothing is to affect the jurisdiction of the State of Minnesota over the waters of the BWCA except that the Federal Government will enforce regulations on the use of motorized equipment on the waters in the wilderness as described in the Act. *Legislative History* at 244.

Senator Wendell Anderson stated the following on the Senate floor on October 14, 1978:

The State of Minnesota owns 26 percent of the surface area (land and water), in the Boundary Waters Canoe Area. There are over 1,000 bodies of water in the Boundary Waters Canoe Area. The State of Minnesota owns all of this water, as well as 10 percent of the wilderness land area. Jurisdiction over waters is a crucial matter of concern to the State of Minnesota. The State of Minnesota, since its creation has maintained jurisdiction over all the water within its boundaries. It is not the intent of this legislation to alter these jurisdictional rights which have been vested in the sovereign State of Minnesota.

Mr. President, I urge the Senate to accept this new management for this unique lakeland area and send it to the President for his signature.

*Legislative History* at 307.

### 4. *Quetico Provincial Park.*

4.1 *Use Regulation.* The BWCAW is complemented in part on the Canadian side of the border by the Quetico Provincial Park of Ontario, which was established originally in 1909. Commercial logging is prohibited in the park by the province of Ontario. Effective April 1, 1979, the use of motor powered watercraft on lakes, rivers and streams within the Quetico Provincial Park is prohibited, except that members of the Lac La Croix Indian band who are also members of the Lac La Croix Guiding Association may use motor powered watercraft to a total of 10 horsepower or less on Quetico, Beaverhouse, Wolseley, Tanner, Minn and McAree Lakes and Maligne River up to Tanner Lake for the purpose of guiding.

4.2 *Unregulated Canadian Waters.* The boundaries of the Quetico Provincial Park do not coincide with the boundaries of the BWCAW on the eastern and western extremities at the International border. The eastern boundary of Quetico Provincial Park meets the International border approximately at American point in Saganaga Lake. The Canadian portions of Saganaga Lake easterly of Saganaga along the International border are unrestricted as to motorboat use. The BWCAW extends easterly and southerly from American point along the international boundary approximately 15 miles to Magnetic Lake, and an additional approximately 30 miles along the international border from South Lake to North Fowl Lake. The western boundary of Quetico Provincial Park meets the international border at Bottle Portage at the most easterly point of Lac La Croix. All of the Canadian portion of Lac La Croix and all Canadian waters westerly of Lac La Croix along the international border are unrestricted as to motorized use, and are currently used for seaplane operation as well as motorboat operation. The BWCAW extends westerly along the international border from Bottle Portage approximately 40 miles through Lac La Croix, Loon Lake, Loon River, and Little Vermillion Lake.

### 5. *Forest Service Orders After 1978 Act.*

5.1 On January 2, 1979, the Regional Forester, Eastern Region, Forest Service, issued an order prohibiting possession or use of snowmobiles in the BWCAW, except on the routes designated in Section 4(e) of the 1978 Act.

5.2 On April 30, 1979, the Regional Forester, Eastern Region, Forest Service, issued an order prohibiting possession or use of motorboats in the BWCAW except as authorized in Section 4(c) and 4(d) of the 1978 Act.

5.3 Pursuant to Section 4(f) of the 1978 Act, the Forest Service established entry point quotas for use of motorboats in the BWCAW in 1979 on lakes listed in Section 4(c) of the 1978 Act.

6. In 1979, the Forest Service issued a map showing the motorized use restrictions established by the 1978 Act for the information of users of the BWCAW.

7. The total number of individual paddle canoeists from outside Minnesota who used the BWCAW in each of the last four years is as follows:

| | |
|---|---|
| 1976: | 38,298 |
| 1977: | 39,803 |
| 1978: | 42,169 |
| 1979: | 43,613 |

The total number of individuals from outside Minnesota who used the BWCAW for all purposes in each of the last four years is as follows:

| | |
|---|---|
| 1976: | 57,217 |
| 1977: | 48,197 |
| 1978: | 63,710 |
| 1979: | 59,253[22] |

### 2. *Discussion*

■ The plaintiffs' complaint alleges, in essence, that Congress is without authority to regulate lands and waters which it does not own. Building from this basic premise, the state and plaintiff–intervenors assert that §§ 4(c), (e), (f) and (i) as well at § 15 are lawfully unenforceable because these statutory provisions regulate lands and waters not owned by the United States, thus infringing those powers retained by the state under the Tenth Amendment. Plaintiffs' prayer requests a declaration that the restrictions in the 1978 Act apply only to lands and waters actually owned by the federal government or that these sections are unconstitutional.

The sole issue raised in this case concerns whether Congress is constitutionally empowered to enact legislation which regulates lands and waters not actually owned by the United States. The Court addressed this question briefly in the discussion section of the order dealing with the first case.

*See* page 1242, *supra.* The Court reaffirms its determination that Congress has the power to regulate all lands and waters in the Wilderness Area to promote the purpose of the BWCAW Act; a more fully–developed analysis follows.

The United States Congress is a lawmaking body of specifically enumerated powers. Simply stated, if the Constitution does not give Congress the power to engage in certain activity, then Congress may not so act. The United States Constitution creates and limits the power of the Congress; it establishes and lists the lawmaking powers of the federal government. *See* Tribe, *American Constitutional Law*, § 5–1 at 224 (1978). If the challenged Act withstands review in this Court, it is because there is a specifically enumerated constitutional provision which provides the necessary power source for the BWCAW Act. Defendants and defendant–intervenors have identified several possible Congressional power sources, any one of which, if it grants Congress the appropriate power, may be raised to sustain the 1978 Act; they include: the Property Clause, U.S. Const. art. IV, § 3, cl. 2; the Commerce Clause, U.S. Const. art. I, § 8, cl. 3; and the Treaty Making Power, U.S. Const. art. II, § 2, cl. 2.

#### (a) *The Property Clause*

The Property Clause of the United States Constitution provides in relevant part that, "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . ." U.S. Const. art. IV, § 3, cl. 2. Congress, in enacting the BWCAW Act, has determined to protect the special qualities of the BWCAW as a natural forest–lakeland wilderness; it has sought to accomplish this goal by, among other things, prohibiting or otherwise regulating the use of motorized vehicles in the Wilderness. The question which arises under the Property

---

**22.** This statement of the facts has been taken almost entirely from counsel's "Stipulation of Facts Dated May 1, 1980." Where the Court deemed it necessary, it inserted corrected citation forms; other citations have been omitted entirely. The Court has also made certain limited grammatical changes in the parties' Stipulation. *See Stipulation of Facts*, Doc. No. Civil 5 79-178 (D.Minn. filed May 20, 1980).

Clause concerns whether "this determination can be sustained as a 'needful' regulation 'respecting' the public lands." *Kleppe v. New Mexico*, 426 U.S. 529, 536, 96 S.Ct. 2285, 2290, 49 L.Ed.2d 34 (1976). In this regard, the Court has stated, "[i]n answering this question, we must remain mindful that, while courts must eventually pass upon them, determinations under the Property Clause are entrusted primarily to the judgment of Congress." *Id.* at 536, 96 S.Ct. at 2290. *See United States v. San Francisco*, 310 U.S. 16, 29–30, 60 S.Ct. 749, 756–757, 84 L.Ed. 1050 (1940); *Light v. United States*, 220 U.S. 523, 537, 31 S.Ct. 485, 488, 55 L.Ed. 570 (1911); *United States v. Gratiot*, 39 U.S. (14 Pet.) 526, 537–38, 10 L.Ed. 573 (1840).

There are three sub–questions posed in the present case: (1) Are the Act's restrictions needful rules; (2) Do these rules "respect" federal lands; and (3) Even if the Act's regulations are needful rules respecting federal land, can such regulations be enforced as to state and privately owned land? *Kleppe, supra,* indicates that questions (1) and (2), *supra,* are presumed by the Congressional finding.[23] The third necessitates some discussion.

The Court in *Kleppe, supra,* characterized the Property Clause as a general grant of power to Congress over federal property. The Court stated that the specific language of Article IV, § 3, cl. 2, however, "gives no indication of the kind of 'authority' the Clause gives Congress over its property." 426 U.S. at 538, 96 S.Ct. at 2291.

Mr. Justice Marshall, speaking for a unanimous Court, reasoned that the scope of Congress' authority under the Property Clause is broad enough to permit federal regulation of private land at least where such regulation is for the protection of federal property. The Court stated that, "the power granted by the Property Clause is broad enough to reach beyond territorial limits." 426 U.S. at 538, 96 S.Ct. at 2291. *See also Camfield v. United States*, 167 U.S. 518, 525–26, 17 S.Ct. 864, 865–867, 42 L.Ed. 260 (1897). *Cf. Hunt v. United States*, 278 U.S. 96, 100, 49 S.Ct. 38, 73 L.Ed. 200 (1928). The basic rule articulated by the Court in *Kleppe, supra,* is that Congress may regulate the use of non–federal land at least where such regulations are needful rules, respecting or protecting the public lands.[24]

The Court of Appeals for the Eighth Circuit has ruled on the specific question raised

**23.** Congress has determined that regulation of motorized uses on lands and waters within the boundaries of the BWCAW is a needful proscription respecting the Wilderness. The Congressional findings in the 1978 Act provide:

> The Congress finds that it is necessary and desirable to provide for the protection, enhancement, and preservation of the natural values of the lakes, waterways, and associated forested areas known (before the date of enactment of this Act) as the Boundary Waters Canoe Area, and for the orderly management of public use and enjoyment of that area as wilderness, and of certain contiguous lands and waters, while at the same time protecting the special qualities of the area as a natural forest–lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational and educational value to the Nation.

§ 1 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649 (1978). This section represents Congress' determination that the proscriptions in the Act are "needful" rules, and that such regulations are designed to promote the purposes of the BWCAW Act. This Court defers to the judgment of Congress in this regard. *See Kleppe v. New Mexico*, 426 U.S. 529, 536, 96 S.Ct. 2285, 2290, 49 L.Ed.2d 34 (1976); *United States v. Brown*, 552 F.2d 817, 822 (8th Cir. 1977), *cert.*

*denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1978). *Accord Izaak Walton League v. St. Clair*, 353 F.Supp. 698, 707–10 (D.Minn.1973).

There have been several judicial determinations in the District of Minnesota upholding the regulation of different motorized uses in the BWCAW as necessary to effect the purpose of having a Canoe Area Wilderness. *See United States v. Peterson*, Doc. No. 5-78–0036M at pp. 9 11 (D.Minn. July 24, 1978) (McNulty, J.); *United States v. Maki*, Doc. Nos. 5–78–2M through 5–78–16M at pp. 4–7 (D.Minn. April 12, 1978) (McNulty, J.); *United States v. Marleau*, Doc. Nos. 5–77–3 through 5–77–12 at p. 8 (D.Minn. May 25, 1977) (McNulty, J.); *Minnesota Federation of Ski Touring Clubs v. Knebel*, Doc. No. Civil 4–76–169 at p. 10 (D.Minn. Jan. 18, 1977) (Alsop, J.); *United States v. Perko*, 108 F.Supp. 315, 317, 322–23 (D.Minn.1952) (Nordbye, J.) aff'd 204 F.2d 446 (8th Cir. 1953).

**24.** In *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), the Court ruled that a federal act designed to protect horses and burros on public lands was constitutionally permissible under the Property Clause. *Id.* at 546, 96 S.Ct. at 2295.

in this case. In *United States v. Brown,* 552 F.2d 817 (8th Cir. 1977), the Court of Appeals characterized the issue before it as "whether the Property Clause empowers the United States to enact regulatory legislation protecting federal lands from interference occurring on non–federal public lands, or in this instance, waters." *Id.* at 822. The Eighth Circuit, relying primarily upon *Kleppe, supra,* ruled that the Property Clause is broad enough to permit federal regulation of non–federal public lands. *Id.*

*Brown, supra,* concerned an individual who was served with a citation for violating National Park Service regulations prohibiting possession of firearms and hunting wildlife in the Voyageurs National Park. Mr. Brown was cited for duck hunting while on waters owned by the State of Minnesota. This Court determined, at Mr. Brown's District Court appeal, that the defendant's actions constituted a significant interference with the prescribed uses of the public park, justifying the issuance of the citation. *United States v. Brown,* 431 F.Supp. 56, 63 (D.Minn.1976). In that case, this Court ruled that the Property Clause empowered Congress to regulate over non–federal lands and waters so long as the legislation respects and protects public property. *Id.* at 62–63. The Court of Appeals affirmed that determination. *United States v. Brown,* 552 F.2d 817, 821–23 (8th Cir. 1977), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1978).

The issue presently before the Court boils down to determining what type of activity constitutes such an interference with federal property that it may properly be regulated. In this Court's *Brown* decision, it was stated:

> The Court, however, specifically declines to decide whether all the regulations of the Park Service which are or may be applicable to water areas not owned by the United States, but which are within the park's boundaries may be enforced under the authority of the Property Clause. *It is only where, as here, certain commercial or recreational activities significantly interfere with the use of the*

> *park and the purpose for which it was established that this Court would agree the United States has authority to regulate the activities on territory over which it has neither acquired ownership nor a grant of jurisdiction from the State.*

431 F.Supp. at 63 (emphasis added).

In the instant case, it is clear beyond doubt that Congress has determined the BWCAW is to be retained as a natural forest–lakeland canoe area wilderness, and that motorized uses within the Wilderness conflict with this purpose. Accordingly this Court finds that the use of motorboats and snowmobiles where otherwise not specifically authorized by the Act significantly interferes with the use of the BWCAW and the purpose for which the Wilderness Area was created. It seems apparent to this Court that in determining what type of activity Congress deems inconsistent with the purpose of the Wilderness, it may paint with a broad brush. The only limitation upon Congress' determination in this area is that its finding be reasonable. In the case at bar, this Court finds that Congress' determination is rational and that the Act's restrictions are reasonably related to the purpose of the legislation, and not arbitrary.

This Court concludes that Congress is constitutionally empowered to regulate the use of non–federal lands and waters under the Property Clause of the United States Constitution and that the present Act is a permissible use of that congressional power.

Since the Court determines that the power to regulate all lands and waters within the BWCAW is granted to the Congress, it follows that such power is not reserved to the States. Accordingly, the State of Minnesota's Tenth Amendment claim must fail, and as a matter of law, judgment must be entered in favor of the defendants and the defendant–intervenors. Based upon this determination, the Court deems it unnecessary to determine whether the Commerce or Treaty Making Powers similarly empower Congress.

(b) *The Water Jurisdiction Issue*

 The State of Minnesota has argued that if this Court were to find the present

piece of legislation a constitutionally permissible congressional enactment under the Property Clause, then the state would be entirely written out of the regulatory picture. The state's position is regretably black and white; it assumes that only one governmental entity can exercise jurisdiction over the surface waters within the BWCAW. This assumption is erroneous and conflicts with the plain language of the statute.

Section 15 of the BWCAW Act provides:

Sec. 15. The Secretary is authorized to promulgate and enforce regulations that limit or prohibit the use of motorized equipment on or relating to waters located within the wilderness in accordance with the provisions of this Act: *Provided, That* nothing in this Act shall be construed as affecting the jurisdiction *or* responsibilities of the State with respect to such waters except to the extent that the exercise of such jurisdiction is less stringent than the Secretary's regulations promulgated pursuant to this section: *Provided further,* That any regulations adopted pursuant to this Act shall be complementary to, and not in derogation of regulations issued by the United States Coast Guard.

The Secretary is authorized to enter into cooperative agreements with the State of Minnesota with respect to enforcement of Federal and State regulations affecting the wilderness and the mining protection area.

§ 15 BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649, 1657–58 (1978).

Section 16(a) of the Act provides:

Cooperation with State

Sec. 16. (a) The Secretary shall cooperate with the State of Minnesota and any political subdivision thereof in the administration of the mining protection area and in the administration and protection of lands within or adjacent to the mining protection area owned or controlled by the State or any political subdivision thereof. Nothing in this title shall deprive the State of Minnesota or any political subdivision thereof of its right to exercise civil and criminal jurisdiction within the wilderness and the mining protection area and impose land use controls and environmental health standards on non–Federal areas within the wilderness and the mining protection area, or of its right to tax persons, corporations, franchises, or other non–Federal property, including mineral or other interests, in or on lands or waters within the wilderness and the mining protection area.

§ 16(a) BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1649, 1658 (1978).

It seems clear from reading these sections that Congress sought, through the BWCAW Act, to construct a management scheme whereby both the federal government and the State of Minnesota would take active and complementary roles in the administration of the Wilderness.

The new Act does not divest the state of jurisdiction over the surface waters within the Wilderness. The only extent to which the state's jurisdiction is restricted by the new Act concerns the situation where Minnesota would wish to open more surface water for motorized use—this the state cannot do. The state, however, could issue regulations restricting motorized uses which are more stringent than the federal restrictions; under the Act, the state could close all the surface waters of the Wilderness to motorboats and snowmobiles.

The state has argued that the issue of using motorboats and snowmobiles is really only a minor concern. The real issue, as it appears to the state, with regard to the jurisdiction of Minnesota over its waters, is its ability to control the use of the water in the BWCAW for every purpose, particularly to restrict any mining operations within the Wilderness.

This Court reads §§ 15 and 16 as stating that Minnesota retains its jurisdiction to control mining in the Wilderness. Nothing in the Act divests the state of its authority to regulate mining in the BWCAW. In fact, since the Act specifically states that Minnesota retains jurisdiction over its waters and may issue even more stringent

regulations, it could thereby restrict the use of the waters in such a fashion as would close the area to mining altogether. The state has expressed misgivings that at some future date it might be read out of the regulatory picture with regard to mining. Even though the federal authorities might wish to allow mining and other development repugnant to the state's notion as to the desirability of the area's being retained as a Wilderness, any court in considering such a construction would have to recognize that the history of the Act and its support by congressional Representatives from Minnesota nowhere contains any intimation that Minnesota ceded its sovereignty to the federal government. The Act contemplates that both the state and federal governments will retain equal control in the Wilderness.

The Act demands a dual sovereign administration so that any federal inclination to disturb the Wilderness would necessarily be reviewed by state authorities as well. The Act contemplates that both federal and state governmental authorities will combine their efforts so that compromise as well as dual sovereign concern will produce effective protection of the Wilderness.

The state contends that in making land exchanges with the federal government and in making all of the necessary accommodations to enable the federal government to establish and maintain a Wilderness Area, they did not, by so doing, contemplate or agree to allow the federal government to pre–empt state control for other purposes. I hold that they have not so ceded jurisdiction; Minnesota can prohibit mining. To hold otherwise would be a total perversion of the entire congressional scheme.

In conclusion, the Court finds there are presently no material facts in dispute, and as a matter of law the plaintiffs' claims must fall; accordingly, summary judgment must be entered in favor of the defendant and defendant–intervenors.

Accordingly, it is Ordered that plaintiff and plaintiff–intervenors' motions for summary judgment are denied; defendant and defendant–intervenors' motions for summary judgment are granted.

## THE THIRD CASE

**C.** *National Ass'n of Property Owners v. Bergland*, Civ. 5–80–25

Plaintiffs in the instant case allege that § 102(2)(C) of the National Environmental Policy Act (NEPA) requires the Secretary of Agriculture to prepare an Environmental Impact Statement (EIS) on the implementation and administration of the BWCAW Act. Plaintiffs' prayer requests that this Court enjoin the federal defendants from implementing the provisions of the new Act until an EIS is prepared.

Defendants and defendant–intervenors have moved for summary judgment pursuant to Fed.R.Civ.P. 56 and dismissal pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1). Plaintiffs have also moved for summary judgment pursuant to Rule 56. After careful review of the entire file and all moving memoranda, the Court determines that plaintiffs' complaint fails to state a claim for relief; defendant–intervenors' motion to dismiss is granted. Accordingly, the remaining motions for summary judgment are denied.

### 1. *Discussion*

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1976) requires, in part, that an EIS be prepared for "major Federal actions significantly affecting the quality of the human environment."[25] 42 U.S.C.

---

**25.** Section 102(2)(C) specifically provides in relevant part:

> The Congress authorizes and directs that, to the fullest extent possible: ... (2) all agencies of the Federal Government shall–
>
> . . . . .
>
> (C) include in every recommendation or report on proposals for legislation and other

major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on–
(i) the environmental impact of the proposed action,

§ 4332(2)(C) (1976). After reviewing the entire file and counsel's memoranda, the Court determines that NEPA does not require the preparation of an EIS prior to the implementation of the new Act. The Court rests this determination on two separate and distinct rationales. First, the Secretary's function as the Administrator of the Act and the actions which his Department engages in through the implementation of the new Act are not "major federal actions" within the meaning of § 102(2)(C). Second, even if it were the case that the Department of Agriculture's enforcement of the Act constituted a "major federal action," to require the Department to prepare an EIS prior to enforcing this more recent mandate of Congress would place NEPA and the BWCAW Act in direct conflict with one another. Such conflict must be resolved in favor of the BWCAW Act under the *Flint Ridge* Doctrine. *Flint Ridge Development Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976).

### a. *Major Federal Action*

The Court of Appeals for the Eighth Circuit has very recently shed some light on the meaning of the term "major federal action" as it is used in § 102(2)(C) of NEPA. In *South Dakota v. Andrus*, 614 F.2d 1190 (8th Cir. 1980), the Eighth Circuit indicated that an appropriate analysis in the instant case demands essentially two inquiries: (1) whether the Department of Agriculture's enforcement of the BWCAW Act constitutes an "action" within the meaning of § 102(2)(C), and (2) whether such action is "major"; that is, whether is significantly affects the quality of the human environment. *South Dakota v. Andrus*, 614 F.2d 1190, 1193 (8th Cir. 1980).

Turning to the first inquiry, this Court notes the general rule that ministerial acts are not within the ambit of NEPA's EIS requirement. In this regard the Eighth Circuit, in *South Dakota v. Andrus, supra*, stated: "Reasoning that the primary purpose of the impact statement is to aid agency decision making, courts have indicated that nondiscretionary acts should be exempt from the requirement." 614 F.2d at 1193 (citing *N.A.A.C.P. v. Medical Center Inc.*, 584 F.2d 619, 634 (3d Cir. 1978); *Monroe County Conserv. Council, Inc. v. Volpe*, 472 F.2d 693, 697 (2d Cir. 1972); *Environmental Defense Fund Inc. v. Corps of Engineers*, 470 F.2d 289, 294 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); *Calvert Cliffs' Coordinating Committee, Inc. v. A.E.C.*, 449 F.2d 1109, 1114 (D.C.Cir. 1971)). The BWCAW Act directs the Secretary of Agriculture to administer the Wilderness in accordance with the provisions in the Act. Congress, itself, has determined how the Wilderness shall be administered. The Act mandates which lakes are motorized and which lakes are not. Likewise, the Act itself mandates the manner in which certain resorts and surrounding lakeshore property is to be purchased by the government. In this regard the Secretary has no discretion. It is the Congress which has spoken; the Secretary must abide by the sovereign's language. It seems obvious to this Court that no EIS is required on the congressional mandate to alter the recreation management scheme in the Wilderness Area. *See Pacific Legal Foundation v. Quarles*, 440 F.Supp. 316, 326 (C.D.Cal.1977).[26] The Act gives the Secretary no discretion to alter the congressional

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (1976).

26. In *Pacific Legal Foundation v. Quarles*, 440 F.Supp. 316 (C.D.Cal.1977), Judge Pregerson, in determining whether a congressional mandate, which required secondary sewage treatment for all sewage plants, necessitated the preparation of an EIS, reasoned:

The court concludes that by Section 301 of the Water Act Congress mandated the application of secondary treatment to sewage plant discharge within the territorial seas or through outfalls. Under the regulations defining secondary treatment, 40 C.F R. Part 133, sludge is prohibited. Obviously, no EIS

proscriptions mandated by the Act.[27] The Eighth Circuit, noting that the Supreme Court has yet to rule on whether non–discretionary actions fall within the scope of NEPA's EIS requirement, has determined that pending final word from the Court, in this Circuit, it is doubtful that a non–discretionary act is an "action" under § 102(2)(C). *Andrus, supra,* 614 F.2d at 1193–94 and n.4.

Turning to the second inquiry, the Court of Appeals for this Circuit has defined the word "major" in terms of whether the alleged federal action is one which "significantly affects the quality of the human environment." *Andrus, supra,* 614 F.2d at 1193–94. *Andrus, supra,* concerned whether the United States Department of Interior, prior to its issuance of a mineral patent to Pittsburgh Pacific Co., was required to prepare an EIS. Along with determining that the federal defendant merely engaged in a ministerial act, thus excepting its conduct from the scope of NEPA, the Circuit Court further reasoned that the issuance of the mineral patent did not enable the mining company to act so as to significantly affect the environment. *Id.* at 1194. The Court in *Andrus, supra,* thus reasoned that so long as the federal action does not enable any person to significantly affect the environment, such action is not considered "major," as the term is used in § 102(2)(C).

In the case at bar, the Secretary's implementation of the Act enables no person to significantly affect the Wilderness. In fact, plaintiffs' major complaint is simply that Congress' mandate to the Secretary will effectively close portions of the Wilderness to many, thus not enabling these persons to motorboat and snowmobile throughout the Wilderness. In essence, plaintiffs' claim is that the Department of Agriculture must prepare an EIS in order to leave nature alone. The Court is not moved by this argument. This Court finds that the Secretary's action in implementing the present Act will enable no one to significantly affect the environment. Accordingly, the Secretary's administrative efforts in implementing the Act are not "major" federal actions within the meaning of § 102(2)(C).

Alternatively, the Court notes that the change in the recreation management of the Wilderness Area as mandated in the new Act is not the type of activity which is considered major federal action within the meaning of § 102(2)(C). In *Lake Berryessa Tenants' Council v. United States,* 588 F.2d 267 (9th Cir. 1978), the Ninth Circuit ruled that a change in recreation management from state to federal authorities, and policies which required the removal of privately–owned floating structures, and restricted the use of houseboats, were not major federal actions within the meaning of § 102(2)(C). *Id.* at 271.

The instant case concerns the administration of a new Wilderness management scheme for the BWCAW; the Act which mandates this change represents Congress' determination that this lakeland canoe area should be protected from certain human uses which could have the effect of destroying its wilderness character. An EIS is generally required where an agency plans to act, or authorizes another to act, in such a manner so as to adversely affect the environment. Here the Congress, through

---

is required on the Congressional mandate to require secondary treatment for all sewage plants. *Id.* at 326.

**27.** Sections 4(g) and (h) of the Act give the Secretary some discretion to terminate motorized uses on certain portages and set forth additional standards and criteria for further defining the type of motorized crafts that may be used in the Wilderness. It may well be the case that if and when the Secretary determines to exercise its discretion pursuant to these provisions, and when the Secretary proposes to implement actions not specifically mandated by

Congress in the Act, an environmental assessment or an EIS may then properly be required. The instant case, however, does not present this issue; therefore the Court declines to rule on the question.

Likewise, § 18 of the Act authorizes the Secretary to intensify the program of dispersed outdoor recreation development on the Superior National Forest outside the boundary of the Wilderness. The Court is not presently faced with the question of whether proposals pursuant to this section require the preparation of an EIS; accordingly, upon this issue the Court declines to issue a final ruling.

legislating the BWCAW Act, and the Secretary whose duty it is to enforce it, are attempting to protect the Wilderness Area from man—thus ensuring that no one will adversely impact the wilderness environment. Accordingly to require the Secretary to prepare an EIS before he may carry out Congress' direction to protect that area seems at a minimum unnecessary, and at the maximum inconsistent.[28]

**28.** Plaintiffs allege that the new Wilderness restrictions will adversely impact the socioeconomic status of that part of Minnesota. This allegation, however, will not sustain plaintiffs' action. The Eighth Circuit Court of Appeals has recently ruled that adverse socioeconomic effects, alone, are not enough to trigger the EIS requirement of NEPA. *Como–Falcon Community Coalition, Inc. v. United States Dep't of Labor*, 609 F.2d 342, 345 (8th Cir. 1979). The fundamental question which must be affirmatively satisfied before the EIS provision applies is: will the agency action adversely impact the natural–physical environment? Judge Lay, speaking for the appeals court in *Como–Falcon, supra*, reasoned:

> When an action will have a primary impact on the natural environment, secondary socio-economic effects may also be considered. *See, e.g., Hanly v. Mitchell*, 460 F.2d 640 (2d Cir.), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.-8(a)(3)(ii) (1975). *But when the threshold requirement of a primary impact on the physical environment is missing, socio-economic effects are insufficient to trigger an agency's obligation to prepare an EIS.*

609 F.2d at 345 (emphasis in the original) (*quoting Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978) (citations omitted). *See also Breckinridge v. Rumsfeld*, 537 F.2d 864, 865 (6th Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *National Ass'n of Govt Employees v. Rumsfeld*, 418 F.Supp. 1302, 1305 (E.D.Pa.1976).

It is instructive to note that Judge Lay, in affirming the District Court's determination that the physical environment was not primarily impacted, quoted this language from District Judge MacLaughlin's Order:

> [L]ocation of the Job Corps center on the Bethel site will not substantially alter the character of the neighborhood. Bethel College and Seminary occupied the site in 1914, thus predating many of the neighboring residences. No new construction has occurred on the campus since 1957. The Department of Labor does not propose construction of additional buildings or major alteration of the face of the campus. *It does intend to refurbish the existing buildings and to budget more funds for grounds maintenance than did Bethel College.* The Court, therefore, cannot overturn the Department's judgment that use of the site as a Job Corps will substantially alter the character of the neighborhood.

609 F.2d at 346. (Quoting *Como–Falcon Coalition, Inc. v. United States Dept. of Labor*, 465 F.Supp. 850, 866 (D.Minn.1978)) (emphasis added) (citations omitted).

It seems that both the District Court, as well as the Court of Appeals assumed that any construction which would occasion a more fully groomed campus is not the type of activity necessitating the preparation of an EIS. In such a case, the action would not adversely impact the character of the neighborhood.

Earlier in NEPA's history, courts were faced with the puzzling question of whether agencies whose functions it is to protect the environment must be bound by § 102's EIS requirement. NEPA's purpose is to protect the environment; its EIS requirement represents one of its protective devices. NEPA, however, is not the only statute enacted by Congress which seeks to protect the environment. Herein lies the dilemma: if to enforce the NEPA "statement" requirement would have the practical effect of frustrating Congress' intent to protect the environment through another environmentally directed statute, then must NEPA apply?

Judge Leventhal, addressing this question in *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C.Cir. 1973), reasoned that NEPA is only a first step toward environmental protection. That court stated:

> The goal of protecting the environment requires more than NEPA provides, i.e., specific assignment of duties to protection agencies, in certain areas identified by Congress as requiring extra protection .... An impact statement requirement presents the danger *that opponents of environmental protection would use the issue of compliance with any impact statement requirement as a tactic of litigation and delay.*

*Id.* at 383–84. Judge Leventhal noted in *Portland Cement, supra*, Senator Muskie's admonition from the Senate floor debate on the applicability of NEPA "statements" to the EPA, pursuant to the Federal Water Pollution Control Act Amendments of 1972. Senator Muskie warned:

> If the general procedural or substantive reforms achieved in NEPA ... were permitted to override, supersede, broaden, or affect in any way the more specific environmental mandate of the FWPCA, the administration of the Act would be seriously impeded and the intent of Congress in passing it frustrated.

*Id.* at 384 n.37 (quoting 118 Cong.Rec. 16878 (daily ed., Oct. 4, 1972)).

### b. The Flint Ridge Doctrine

In *Flint Ridge Development Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), the Supreme Court, noting that § 102's requirements are neither "accidental nor hyperbolic," nevertheless ruled that "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." *Id.* at 787–88, 96 S.Ct. at 2438. The Court reasoned that if requiring the Secretary of the Housing and Urban Development Authority to prepare an EIS would create an irreconcilable and fundamental conflict with the Secretary's duties under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* (1976), then NEPA must yield and no EIS is required.

In *Flint Ridge, supra*, environmental protection groups petitioned the Department of HUD to prepare an EIS before the Department permitted a private real estate developer's statement of record as to a proposed subdivision project adjacent to a state–designated "scenic" river in Oklahoma to become effective. The Disclosure Act required private real estate developers to file statements of record as to new subdivisions and furnish property reports to prospective purchasers. These statements of record were to become automatically effective within thirty (30) days of their being filed with the Department, unless found to be incomplete or inaccurate.

The Court ruled that the Disclosure Act mandated the effective date of accurate and complete statements of record as the thirtieth day after filing. It noted that an EIS could not possibly be completed within the thirty (30) day period, and accordingly found a conflict. The Court stated:

> The Secretary cannot comply with the statutory duty to allow statements of record to go into effect within 30 days of filing, absent inaccurate or incomplete disclosure, and simultaneously prepare impact statements on proposed developments. In these circumstances, we find that NEPA's impact statement requirement is inapplicable.

426 U.S. at 791, 96 S.Ct. at 2440. *Flint Ridge, supra*, instructs that when it is not possible to follow the EIS requirements without conflicting with another specific statutory mandate, then NEPA must yield. *See Alaska v. Carter*, 462 F.Supp. 1155, 1161 (D.Alaska 1978). *Accord Gulf Oil Corp. v. Simon*, 502 F.2d 1154, 1156–57 (Temp.Emer. Ct.App.1974); *Dry Color Manufacturers' Ass'n v. Department of Labor*, 486 F.2d 98, 107–08 (3d Cir. 1973); *Atlanta Gas. Light Co. v. Federal Power Comm'n*, 476 F.2d 142, 150 (5th Cir. 1973).

The instant case presents this conflict; the BWCAW Act mandates that the Secretary of Agriculture administer the Boundary Waters Wilderness in accordance with the provisions in the Act. Section 4(c) directs that "*[e]ffective* on January 1, 1979" the motorized use restrictions shall be ad-

---

The District of Columbia Circuit in *Portland Cement, supra*, however, declined to formulate a broad exemption from NEPA for all agencies acting, in one form or another, to protect the environment. Instead, the court construed a narrow exception from NEPA applicable to determinations under § 111 of the Clean Air Act. That court determined, ultimately, that § 111 required the functional equivalent to a NEPA statement. *See also Environmental Defense Fund, Inc. v. EPA*, 489 F.2d 1247, 1257 (D.C. Cir. 1973); *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 650 n. 130 (D.C.Cir. 1973); *Anaconda Co. v. Ruckelshaus*, 482 F.2d 1301, 1305–06 (10th Cir. 1973); *Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 174 (6th Cir. 1973); *Appalachian Power Co. v. EPA.*, 477 F.2d 495, 508 (4th Cir. 1973).

This Court is mindful of the fact that *Portland Cement, supra*, and the cases cited thereafter are all factually dissimilar to the instant case. The cases cited *supra* all involve the EPA's administration of the Clean Air Act or the FWPCA Amendments of 1972. The Court highlights these earlier cases only in an effort to note that NEPA is not the only road to environmental protection, and that where Congress has constructed other thoroughfares toward such protection NEPA should not be raised as a detour toward such a goal.

It should also be noted that § 20 of the BWCAW Act directs the Secretary to submit a comprehensive management plan to the Congress no later than October 1, 1981, setting forth the specific management procedures to implement the Act's objectives. This provision represents Congress' express direction as to what it wants studied, and the manner of the study; in this way, § 20 highlights NEPA's inapplicability to the BWCAW Act.

ministered by the Secretary. § 4(c) BWCAW Act, Pub.L. No. 95–495, 92 Stat. 1650 (emphasis added). Likewise the other provisions of the Act are mandated to take effect at the time of the statute's enactment. If this Court were to legislate into the BWCAW Act the additional requirement that the motorized use proscriptions could not be enforced until an EIS was filed or, for that matter, any other of the mandatory provisions in the Act, then it would create a clear conflict in statutory authority. *See Alaska v. Carter*, 462 F.Supp. 1155, 1161 (D.Alaska 1978). Accordingly, NEPA does not compel the Secretary to prepare an EIS in the instant case. Plaintiffs' complaint therefore fails to state a claim upon which relief may be granted; defendant–intervenors' motion to dismiss is granted.

### ORDER

Based upon the Findings of Fact and Conclusions of Law set out above, it is ORDERED:

1. In Civil 5–79–95: plaintiffs' motion for summary judgment is denied; defendants' and defendant–intervenors' motion for summary judgment is granted.

2. In Civil 5–79–178: plaintiff and plaintiff–intervenors' motion for summary judgment is denied; defendant and defendant–intervenors' motion for summary judgment is granted.

3. In Civil 5–80–25: defendant–intervenors' motion to dismiss is granted; the remaining motions for summary judgment are denied.

### SUPPLEMENTAL ORDER

By date of August 4, 1980, the Lac La Croix Indian Band and Campbell's Cabins and Trading Post, Ltd., moved the Court to alter its judgments of dismissal of July 25, 1980, in the above civil actions, pursuant to Rule 59(e), Fed.R.Civ.P.[1] The relevant facts with regard to the Indian Band's and Campbell's motion follow.[2]

These two entities claim that the 1978 BWCAW Act,[3] to the extent that it prohibits use of motor powered boats on international boundary waters within the BWCAW, conflicts with and affects Article I of the Root–Bryce Treaty of 1909.

The Indian Band is a community of 240 Canadian Indians located in a roadless area on the North (Canadian) shore of Lac La Croix at the Namakan River on the Neguaguon Lake Indian Reserve. The Band claims its livelihood is derived from the commerce of guiding fishing parties on Lac La Croix in the summer and trapping in the winter.

Campbell's is a Canadian corporation which owns and operates a fishing resort and trading post on the north (Canadian) shore of Lac La Croix three miles west of the Neguaguon Indian Reserve. Indians from the Band work at Campbell's as guides.

The Root–Bryce Treaty between the United States and Great Britain, Treaties in Force, U. S. and Canada, p. 26, provides in Article I as follows:

"The High Contracting Parties agree that the navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, subject, however, to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation and applying equally and without discrimination to the inhabitants,

1. On August 15, 1980, the moving parties withdrew their request insofar as it applied to the second of the three related cases, *State of Minnesota, et al. and Carl Brown, et al. v. Robert Bergland, et al. and Sierra Club, et al.*, Civil Action No. 5–79–178. Accordingly, the Court's order directly affects only the two remaining cases.

2. The Lac La Croix Indian Band is a party to the first of the three related civil actions, *Nationl Association of Property Owners, et al. and*

*State of Minnesota v. United States, et al. and Sierra Club, et al.*, Civil Action No. 5–79–95. Campbell's Cabins and Trading Post, Ltd., is an entity that is not formally a party to any of the three civil actions, but Robert J. Handberg, d/b/a Campbell's Cabins and Trading Post, is a party to the first civil action.

3. The Boundary Waters Canoe Area Wilderness Act of 1978, Public Law 95–495, 92 Stat. 1649 (October 21, 1978).

ships, vessels and boats of both countries."

Section 4 of the 1978 BWCAW Act specifically prohibits the use of motorized vehicles on international boundary waters within the BWCAW, with specific exceptions. The international boundary waters in the BWCAW include the following lakes and waterways: Little Vermillion Lake, the Loon River, Loon Lake, Lac La Croix, the Bottle River, Bottle Lake, Iron Lake, Crooked Lake, the Basswood River, Basswood Lake, Sucker Lake, Birch Lake, Carp Lake, Seed Lake, Knife Lake, Cypress Lake, Swamp Lake, Saganaga Lake, Gunflint Lake, North Lake, South Lake, Rose Lake, Mountain Lake, Moose Lake, North Fowl Lake and South Fowl Lake. Some motorized use is allowed on a portion of Lac La Croix, Moose Lake, Sucker Lake, a portion of Basswood Lake, a portion of Saganaga, North Fowl, South Fowl, Basswood River, Carp Lake, and Knife Lake. (The size of motors is restricted, however, on these waters except a portion of Lac La Croix.)

Section 17 of the 1978 BWCAW Act provides in part that: "Nothing in this Act shall affect the provisions of any Treaty now applicable to lands and waters which are included in the . . . wilderness."

### I.

This is not the first time that a party to this action has urged the Court to invalidate the Act because of an alleged conflict with a preexisting treaty. The initial complaint in this matter raised challenges to the Act under the Webster–Ashburton Treaty of 1842, another treaty that concerns the regulation of boundary waters between the United States and Canada.

The Court's Memorandum Opinion dated July 24, 1980, addressed the plaintiffs' Webster–Ashburton claims and determined that they did not affect the Act's validity. To achieve that result, the Court followed the rule set out in *The Chinese Exclusion Case*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889): as to the domestic law of the United States–that is, the law to be applied by this Court–where a later piece of legislation

conflicts with an earlier enacted treaty, the statute controls. *See* Memorandum Opinion, at page 1251.

The Indian Band and Campbell's in their memorandum recognize the validity of this well–established legal principle. In order to avoid its effect, however, they belatedly argue Section 17 of the 1978 BWCAW Act, which states that "nothing in this act shall affect the provisions of any treaty now applicable to lands and waters which are included in the mining protection area and the wilderness." The argument continues that in order to read the Root–Bryce Treaty in consonance with Section 17, the conclusion has to be drawn that the clear, specific motorized route prescriptions in the statute cannot and do not mean what they say.

For the reasons outlined below, the Root–Bryce contentions fail to state a claim upon which the plaintiffs can obtain relief. The validity of the BWCAW Act, first passed upon in the Memorandum Opinion, is once again affirmed, and this latest challenge to its legality is dismissed.

### II.

A. The success of plaintiffs' claims under statutory Section 17 depends upon a preliminary finding that the Root–Bryce Treaty is impermissibly affected by Section 4 of the Act. If no conflict exists between the Treaty and Section 4, Section 17's admonition against affecting treaty provisions is not even called into play.

Article I of the Root–Bryce Treaty not only commits the contracting parties to keep navigable boundary waters free and open to the citizens of both countries equally but also reserves each nation's rights to regulate the boundary waters within its own territory. Pursuant to that reserved regulatory power, the province of Ontario, Canada, has barred motorboats and snowmobiles in the Quetico Provincial Park–adjacent to the BWCAW along an extensive portion of the international boundary–with an exemption for several lakes where motors can be used by the Lac La Croix Band. Memorandum Opinion, p. 1234. When it approved the 1978 BWCAW Act, Congress was well aware of the Canadian regulations

and thus had no reason to think that Section 4 violated any treaty with Canada; Canada was already doing something very similar to what the United States proposed.

Both contracting parties to the Treaty, then, have recognized by their regulatory actions that the Root–Bryce Treaty does not prohibit motorized use restrictions such as those at issue; however, the plaintiffs urge the Court to find that the Root–Bryce Treaty creates an absolute right to use motorboats in boundary waters, a right with which the reserved regulatory powers cannot interfere. This the Court cannot do, for it would require ignoring the plain wording of the Treaty as well as its clear intent.

Specifically, Article I of Root-Bryce provides that "navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to the inhabitants and to the ships, vessels, and boats of both countries *equally*." (Emphasis added.) The essence of the entitlement conferred by the Treaty is not the creation of a right of access to navigable boundary waters, but the preservation of an equal right of passage along the border to the citizens of both nations. The Treaty, in short, outlaws discrimination by one country against the citizens of the other.[4]

In that respect, the Root-Bryce provision is similar to the Webster-Ashburton Treaty, and the advice from the State Department to Congress concerning the meaning of language in the Webster-Ashburton Treaty applies with equal force to the Root-Bryce Treaty. As Robert J. McCloskey, an assistant secretary of state, explained, a clause preserving the free and open status of the international waters was intended not to guarantee the use of mechanized transport therein, but to prevent discrimination:

> At the time, the Webster-Ashburton treaty was signed, the waterways and portages of this area were an important route to the West. We believe that the intent of the "free and open" provision for these waters was to ensure that this important route remained open, on an equal basis, to

the nations of both countries. It would not be correct, however, to interpret "free and open" so broadly as to prohibit either United States or Canadian authorities from imposing any limitation upon the manner in which such waterways and portages may be used. In agreeing to free and open use of these waterways and portages, neither party intended to relinquish its sovereign role of imposing statutory limitations on behavior which would not be in the best interest of the respective country.

Letter from Robert J. McCloskey to Honorable James L. Oberstar, Exhibit 7B to Affidavit of Dr. Miron L. Heinselman, *National Ass'n of Property Owners v. United States,* (D. Minn., July 28, 1979).

The language reserving the power to regulate within Article I of Root-Bryce also comports with McCloskey's interpretation of the Treaty's essential purpose as being the prohibition of discriminatory regulation. The Treaty states that the right of equal access is "subject to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation and applying equally and without discrimination to the inhabitants, ships, vessels and boats of both countries." The motorized use restrictions in force on both sides of the border fall within that reserved regulatory power, for they are nondiscriminatory and therefore do not interfere with the "privilege of free navigation" as defined in Article I of the Root-Bryce Treaty. In fact, under the 1978 BWCAW Act, the traditional form of travel in the canoe country (that is, by canoe) is allowed to citizens of both countries on an equal basis. Emphasizing the Act's restrictions and their validity should not obscure the fact that the boundary waters continue to remain free and open to nonmotorized vehicles, be they commercial or recreational, Canadian or American.

The essential command of the Root-Bryce Treaty of 1909 is that citizens of both the United States and Canada be treated on a

---

4. The special privilege afforded the Indian Band in Quetico, therefore, gives one pause for thought.

par within the boundary waters. The 1978 BWCAW Act adheres to that longstanding and equitable notion, even as it permits some uses and restricts others; that even-handedness is the most important indication that no treaty has been violated.

Furthermore, the fact that Congress enacted both Section 4 and Section 17 strongly suggests that Congress interprets the Root-Bryce Treaty of 1909 as permitting nondiscriminatory motorboat restrictions on the international boundary waters. It would have made no sense for Congress to expend the massive amount of time and effort that went into the specific restrictions and compromises of Section 4 if the general language of Section 17 voided large parts of those restrictions from the start. Given the Congressional awareness of the Canadian regulations and the careful detail of Section 4, it is unreasonable to conclude that Congress intended Section 17, through the Root-Bryce Treaty, to strike down the thrust of the BWCAW Act. The most reasonable inference is that Congress felt the Root-Bryce Treaty, like Webster-Ashburton, did not conflict with Section 4 in the first place.

The Root-Bryce Treaty and Sections 4 and 17 of the 1978 BWCAW Act can all be reconciled on one basis: in light of the emphasis in the Root-Bryce Treaty on equality of treatment, the intent of Congress in passing the 1978 Act and the similar motorized use restrictions in Canada, the unequivocal motorized use restrictions in Section 4 of the Act do not violate any treaty; Section 17 (in concert with Root-Bryce) does not inhibit the effectiveness of the remainder of the Act, and plaintiffs' motion must be denied.

■ B. Although the Court, in denying plaintiffs' motion, expressly holds that no conflict exists between the 1978 BWCAW Act and the Root-Bryce Treaty, even if an inconsistency were found, the result in this case would not change. The regulations of Section 4 would withstand the present challenge in any event.

The plaintiffs contend that Section 17 of the Act requires the invalidation of Section 4 of the same statute because of an alleged conflict with Root-Bryce. To reach that conclusion, they contend that the universally accepted principle that later enacted legislation controls an earlier treaty is abrogated by Section 17's general command that nothing in the Act shall affect a valid treaty.

Plaintiffs made the same argument with respect to the Webster-Ashburton Treaty, but this Court held that the later legislation controls nonetheless. Memorandum Opinion, p. 1251. The result is the same for the Root-Bryce Treaty of 1909: even if Section 4 of the Act were in conflict with the Root-Bryce Treaty of 1909, Section 4 would control. Section 17 does not change that outcome. Congress specifically named international boundary waters in Section 4 of the Act and specifically placed restrictions on such waters. The general provision of Section 17 does not nullify the specific restrictions in Section 4 of the Act; that would be reading into Section 17 an effect not intended by its authors. Nothing in the legislative history brought to the Court's attention suggests Congress had it in mind to use Section 17 to undo the comprehensive regulatory scheme simultaneously established in Section 4.

The very absurdity of invalidating the specific, detailed restrictions of Section 4 based upon the broad terms of Section 17 reinforces the conclusion that the 1978 Act stands as written. It also indicates that Congress, when enacting Section 17, was of the opinion that the restrictions in Section 4 did not violate any treaty in force, and it thereby shows the difficulty of assuming a conflict between the Act and the Treaty even for the purposes of argument. Difficult tasks, however, cannot always be avoided, and therefore the Court expressly finds that the traditional principle articulated in *The Chinese Exclusion Case, supra,* would govern this matter even if Section 4 conflicted with the Root-Bryce Treaty. Section 17 does not block the application of that well-established legal rule to the 1978 BWCAW Act, and the restrictions of Section 4 would take precedence over the Root-Bryce Treaty in the event of an inconsistency.

C. In sum, the Court bases its decision to uphold the regulations in the 1978

BWCAW Act on alternative grounds: first, it finds that the motorized use restrictions in Section 4 do not violate any treaty, including Root-Bryce; second, even if Section 4 conflicted with Article I of Root-Bryce, the Court holds that the later enacted statute would control.

## ORDER

Accordingly, IT IS HEREBY ORDERED, that the motion of the Lac La Croix Indian Band and Campbell's Cabins and Trading Post, Ltd., to alter judgment is in all things denied.